GENERAL REFRACTORIES COMPANY, Appellant, v. STEVE SEBEK, FRANCES SEBEK, FRANK A. TOELKE and AMERICAN REFRACTORIES COMPANY.—44 S. W. (2d) 60.

Division One, November 20, 1931.

1144

*Leslie B. Hutchison* and *James Booth* for appellant.

*W. L. Cole* and *T. P. Hukriede* for respondents.

RAGLAND, J.—This is a suit in equity seeking the reformation of a written instrument, a mining lease, on the alleged ground of mutual mistake. After hearing the evidence the circuit court gave judgment for defendants, and this appeal on the part of plaintiff followed in due course. The lease out of which the controversy grows is one which was given by Steve Sebek and Frances Sebek, husband and wife, as lessors, to respondent Toelke, as lessee. The lease recites:

"The Lessors hereby grant unto the Lessee, his successors and assigns, all the fire clay, diaspore and other alumina minerals upon and contained in the tract of land in Canaan Township, Gasconade County, Missouri, and described as follows:

"Part of E 1/2 N. E. sec. 10. 79 acres more or less and N 1/2 N. W. N. W. Sec. 11 20 more or less. No mining and drilling within 200 yd. of any building, all in Twp. 41 Range 5.

"Together with the right to mine and remove said materials and to construct and operate upon said lands, roads, railroads, chutes, bins and other means of transporting these minerals and also minerals and supplies to and from other lands to points of use or shipment, and with further right to erect and operate on said tract of land, all building machinery, tools and appliances required in the mining and preparing for market or use of the fire clay, diaspore, diasporite and other alumina minerals from this land. And with the right to remove all buildings, machinery, tools and appliances in the event that Lessee surrenders this lease as hereinafter provided."

In consideration of such grant the lessee obligated himself to pay certain royalties on the fire clay, diasporite and other alumina materials, "as removed, shipped or used off the premises described." The lease was executed June 13, 1922, and was subsequently assigned by Toelke to the American Refractories Company and by it to the appellant.

The particular clause of the lease which gives rise to the controversy is the one following: "No mining and drilling within 200 yd. of any building." It is the contention of appellant that the term of the contract in that respect which the parties had in fact agreed upon and which they intended should be inserted in the lease was this: No mining and drilling within 200 *feet* of any building; that the word yards, instead of feet, was inserted through the inadvertence or mistake of the scrivener. Respondents Sebek on

the other hand insist that the lease as written correctly sets forth in all respects the agreement of the parties.

Appellant (plaintiff below) in support of its contention offered two witnesses: Toelke and one Remmert. Their testimony, with immaterial matters and repetitions omitted, will be set out, in narrative form in part.

### Toelke: Direct-Examination.

In 1922 I lived at Gerald and was engaged in the clay business. I know Steve Sebek and Frances Sebek and did in 1922. On January 13th of that year I went to the Sebek house to take a clay lease on their property. On our arrival Mr. Sebek came to the house.

"Q. Now, was there anything said in the house between you and Mr. Sebek about leasing his property to you, and if so, tell the court what was said? A. Yes, sir. Well, I went over there and asked him whether he had any clay on his place. He said, 'Yes.' I asked him where his pit was. He said, 'Below the house a little piece.' And we walked down to the pit, and when we came back to the house—on the way back, I talked to him about the clay asking him about the leasing of it, and how he would lease it, and whether he would lease it. He said, yes, he would lease it providing the lease was all right. And we went back to the house. He said he couldn't understant English very plain; his wife could understand better than he could. And we went back to the house and we fixed up the lease. . . .

"Q. What was said about mining close to the house, if anything, there? A. Well, when we drew up this lease, I told him we didn't want any more rights than where the clay was, we usually had in a lease: 'No mining or prospecting done within 200 feet of any building he had on the place.'

"Q. What did he say when you told him that? A. He said he wanted that in there.

"Q. Wanted what in there? A. That we would stay 200 feet from any building. . . . I told him I usually put that in, because if the lease was transferred to somebody else they couldn't mine his buildings. . . .

"Q. Now, did you tell him you would put it in the lease? A. Yes, sir.

"Q. Now, what was said about Mr. Remmert preparing this lease for you? A. Well, I asked Mr. Remmert to write the lease for me, and he said it was all right.

"Q. Who said it was all right? A. Mr. Sebek; he didn't make any objections to it.

"Q. And did Mr. Remmert write the lease? A. Yes, sir.

" (Plaintiff's Exhibit A so marked for identification.) . . .

"Q. Is that the lease that you took from Mr. Sebek that day that you have been testifying about? A. Yes, sir.

"Q. I will call your attention to the exception in the description there, Mr. Toelke, and have you to state whether or not that is the exception that you and Mr. Sebek agreed upon? . . . A. This was read over there twice; I says, 'If this lease isn't satisfactory, I don't want you to sign it, because I don't take a lease unless you are satisfied.' And he said it was all right; he would sign it.

"Q. Look at that exception '200 yards,' and state to the court whether or not that was what was agreed on between you and Mr. Sebek at the time you discussed it. A. It should be 200 feet. . . .

"MR. HUTCHISON (Q) : I will have you read that exception in the lease, Mr. Toelke. A. (Reading) 'No mining and drilling within 200 yd. of any building.'

"Q. Do you know how that came to be put in there? A. No sir; I don't.

"Q. Who put it in there? A. Remmert, I guess.

"Q. Had there been anything said between you and Mr. Sebek about putting a clause of that kind in there, 200 yards? . . . A. No, sir.

"Q. When did you first learn of this mistake, Mr. Toelke? A. Well, I heard of this about—I think it was in September, some time.

"Q. What year? A. 1928.

"Q. Did you go and see Mr. Sebek after you learned of this mistake? A. Yes, sir. . . .

"Q. Tell the court what the conversation was there in the house between you and Mr. Sebek. A. I went over to see Mr. Sebek and asked him about this lease, about this mistake being made; in place of being 200 feet it was 200 yards. He said yes, it was a mistake, and he wrote to the company for it to be corrected. I says, 'You haven't any more clay on your place than this pit.' I says, 'You intended for me to have this pit at the time I was taking the lease.' He said, 'Yes,' and that was about all of the conversation we had."

Cross-Examination.

"Q. You say you and Mr. Remmert went to Sebek's house together? A. Yes, sir.

"Q. And there you engaged in a conversation with him about this lease? A. Yes, sir.

"Q. What language did you talk in, Mr. Toelke? A. English

"Q. You can't talk the Polish or Bohemian language? A. No, sir.

"Q. And Mr. Sebek could talk English with you, could he? A. No, sir; he couldn't.

"Q. Well, I thought you said you and Mr. Sebek went down and looked over this proposition? A. Some little conversation we had,

it wasn't very plain; that is the reason he told me we had better go to the house, his wife talked English.

"Q. And when you got through with the conversation and had agreed on the terms of this lease, you say Mr. Remmert wrote it up? A. Yes, sir.

"Q. Wrote it in the Sebek house, did he? A. Yes, sir.

"Q. You are positive of that now, Mr. Toelke? A. Yes, sir.

"Q. Isn't it a fact there was no one there when this lease was written but you and Sebek and his wife? A. No, sir; Remmert was with me; he was with me all of the time.

"Q. And you read this lease to them, or told Remmert to? A. I believe Remmert read it to them.

"Q. How many times did he read it over to them? A. I believe once, or twice, maybe.

"Q. Didn't you say awhile ago you read it twice, because you wanted to be sure that he understood it? A. Yes, sir.

"Q. And do you know now whether Mr. Sebek did understand it or not? A. Well, he said he did.

"Q. Will you say whether you yourself read it or whether Remmert read it to him? A. Well, I don't remember whether I read the lease or whether he did.

"Q. But you were present when it was read? A. Yes, sir.

"Q. And you can understand the English language? A. Yes, sir.

"Q. And this lease was read twice over by yourself, or in your presence, and you didn't detect the fact that it read 200 yards instead of 200 feet? A. I don't think the 200 yards was mentioned.

"Q. In other words, you don't think the whole lease was read? A. Well, I suppose it was.

"Q. I thought you told me just awhile ago you had it read because you wanted to know that he understood the fact that you weren't to do any mining close to his house? A. Yes, sir.

"Q. And still you don't know whether they read the clause that limited him to a certain distance from his house? A. Well, I don't know whether he said 200 feet or 200 yards.

"Q. Whether who said that? A. The man that read the lease.

"Q. And you don't know whether you read it or Mr. Remmert read it? A. No, sir.

"Q. And you don't know now whether Sebek understood the lease when you read it? A. I suppose he did; he signed it.

"Q. He told you it was all right, you say? A. Yes, sir.

"Q. And you had it read in order that he might see whether it contained any mistakes? A. Yes, sir.

"Q. And you didn't know after the second reading that it did contain any mistakes as to the distance you were to mine to the house? A. Yes, sir."

### Redirect-Examination.

"Q. Mr. Toelke, if you didn't mine any fire clay within 200 yards of any building of Mr. Sebek's, as provided in this lease, would you have covered any pit at all? No, sir. . . .

"Q. Then the pit that is there is within 200 yards of a house? A. Yes, sir. . . .

"Q. It had been prospected out before you bought it? A. Yes, sir.

"Q. And the prospects were plain when you and Mr. Sebek went down there and he showed it to you? A. Yes, sir.

"Q. Do you remember how far it is from the nearest building of Mr. Sebek's to that pit? A. No, sir; I don't know.

"Q. You didn't measure that? A. No, sir; I didn't measure it. . . ."

### Recross-Examination.

". . . Q. You say now that you found out since that lease was made that this pit was inside of that 200 yards of the house? A. Yes, sir.

"Q. You found that out because Mr. Sebek gave a lease to someone else and they opened up a pit? A. Well, I don't know whether I got the news through that, but I heard there was a lease given to somebody else.

"Q. And that lease was inside of this 200 yards of the house? A. Yes, sir."

### Remmert: Direct-Examination.

". . . Q. I will ask you if you were at Mr. Sebek's home about the 13th of June, 1922? A. Yes, sir.

"Q. Who did you go there with? A. With Mr. Toelke.

"Q. Do you know what took place that day between Mr. Toelke and Mr. Sebek? A. Well, the best of my recollection they tried to lease a fire clay pit from him.

"Q. Who drew up that lease? A. I did.

"Q. As a notary public? A. Yes, sir.

"Q. Took the acknowledgment? A. Yes, sir.

"THE COURT: The fire clay pit covers thirty or forty acres, doesn't it?

"MR. HUTCHISON: It covers all of his land, your Honor.

"Q. Now, tell the court what was said there between Mr. Sebek and Mr. Toelke about you writing the lease and all that was said, Mr. Remmert? A. Mr. Toelke told Mr. Sebek I was a notary and if he was willing that I draw the papers.

"Q. What did Mr. Sebek say? A. He said it was all right.

1150

"Q. Did you hear them say anything about the exceptions that was to go into the deed? A. Yes, sir.

"Q. What was that? A. There was no mining or drilling to be done within 200 feet of any building.

"Q. That was the agreement made between who—who said that? A. Why, Mr. Toelke suggested it.

"Q. And what did Mr. Sebek say? A. He said that was all right.

"Q. What did he say about it going in the lease, if anything? A. He wanted it in the lease.

"Q. I hand you plaintiff's Exhibit A. Look at it and state whether or not that is the lease you prepared there that day? A. Yes, sir.

"Q. Did you prepare that lease in conformance with the request of Mr. Sebek and Mr. Toelke? A: Yes, sir; I wrote it.

"Q. Just answer the question. Did you write it in conformity to the request of Mr. Sebek and Mr. Toelke? A. Yes, sir.

"Q. Did you write it just as they had requested you to? A. I didn't, according to this.

"Q. Wherein is the difference? A. Instead of 200 yards, it ought to be 200 feet.

"Q. Do you know how you came to put the 200 yards in there? A. I don't.

"Q. Did anybody suggest to you that you put 200 yards in there? A. No, sir. . . .

"Q. Now, at the time you wrote this lease, did you know at that time that you had written the 200 yards instead of 200 feet? A. I did not; no, sir.

"Q. When did you first discover that you had made this mistake, Mr. Remmert? A. Why, it was the other day. . . ."

Cross-Examination.

"Q. Mr. Remmert, this exhibit that has been offered to you here, you say that you and Mr. Toelke went over there together on what day of the month, and what month was it, to get this contract? A. I don't remember what the date was, Mr. Cole.

"Q. Well, you only went one time, didn't you? A. Yes, sir.

"Q. You went over there—I think it was made on the 13th of June, wasn't it? A. I think so; I don't know; I am not sure.

"Q. The 13th day of June, 1922? A. Yes, sir.

"Q. And you took the acknowledgment right there, did you? A. Yes, sir.

"Q. Mr. Remmert, I wish you would look at that thing and tell how it is—it is written with a pencil, or one colored ink, and the acknowledgment taken in a different colored ink? A. Well, I can tell you that.

"Q. All right. A. We had two different pens.

"Q. And that is the way you account for it? A. Yes, sir.

"Q. Well, whose pen was the body of the instrument in? A. In Mr. Toelke's.

"Q. And whose pen was the acknowledgment written in? A. In mine.

"Q. Another thing I want to call your attention to, Mr. Remmert, and that is this thing is dated the 13th day of June, 1922, and your acknowledgment is taken on the 23rd day of August, 1922. How do you account for that? A. Well, I don't know.

"Q. You don't know? A. No, sir; I don't remember that.

"Q. You don't remember that? A. No, sir.

"Q. You wrote that thing and took the acknowledgment to it, and you say you did it all the same day; how do you account for the fact it is dated on the 13th day of August? A. I don't remember, Mr. Cole.

"Q. How many copies of that contract did you make? A. I think we made two.

"Q. I call your attention to defendant's Exhibit No. 1 and call your attention to the fact that it is dated on the 13th day of June and acknowledged on the 23rd day of August? A. Well, Mr. Cole, I don't know about that.

"Q. Now, isn't this the fact of the matter: That you were not there at all when the contract was made; that Toelke made the contract, and you were not there? A. Yes, sir; I was there.

"Q. Were you there when the contract was taken? A. Yes, sir.

"Q. How is it you dated it on the 13th day of June and took your acknowledgment on the 23rd day of August? A. Well, Mr. Cole, I can't tell you."

### Redirect-Examination.

"Q. Was this acknowledgment taken on the same day that you wrote the lease out there? A. I thought it was, but I am not sure; I couldn't tell you.

"Q. Did Mr. Sebek and his wife sign it on the same day that you were there? A. Yes, sir.

"Q. Mr. Cole has shown you another exhibit, or a copy of a lease, which purports to be signed the same date as plaintiff's Exhibit A. Now, I will ask you if Mr. Sebek signed this lease at the same time he signed the other copy? A. Well, I think he did; I am not sure; I don't know.

"Q. You took the acknowledgment of it, too, you say? A. Yes, sir; we always drew up two.

"Q. Were both leases written at the same time by you? A. Yes, sir.

1152

"Q. Both signed at the same time? A. Yes, sir.

"Q. In your presence? A. Yes, sir.

"Q. And you can't explain now the difference in the date of the lease and the acknowledgment? A. No, sir; I don't remember that at all. I have forgotten how that was."

### Recross-Examination.

". . . Q. How many times were you at Sebek's house? A. One time.

"Q. Did you read this lease over to Sebek after you had gotten through with it? A. Yes, sir.

"Q. How many times did you read it? A. Once.

"Q. You are sure that is all, are you? A. Yes, sir.

"Q. Did Toelke read it to him? A. I don't remember whether he did or not.

"Q. And this 200 yards in here, you say, was read to him as 200 yards, was it? A. Well, I don't remember whether it was read to him as that or not."

A third witness called by plaintiff testified that a week before the trial he measured the distance between the clay pit referred to in Toelke's testimony and the nearest building on the land and found it to be 348 feet.

Both the Sebeks testified that Toelke wrote the lease; that Remmert was not present; that they did not know Remmert and had never seen him until at the trial; that Steve Sebek told Toelke at the time they were discussing the terms of the lease that no mining should be done within 200 yards of any building; and that Toelke said he would put that in the lease. On cross-examination Sebek admitted that he intended to lease to Toelke the clay pit shown the latter just before the writing was prepared and signed.

The testimony of the witnesses, Toelke and Remmert, has been set out at length in order that it may speak for itself. Because of its vagueness, incoherence and contradictions touching crucial matters it is manifest that it can be given but little weight. That it shows on its face that the witnesses who gave it had no distinct recollection of anything that occurred in connection with the taking of the lease is not a matter of surprise when it is considered that six years had elapsed since that event. Indeed, the evidence leaves it doubtful as to whether Remmert was present at all when the lease was prepared and signed. The Sebeks say he was not; and he gave no rational explanation as to why he wrote the body of the lease, in duplicate, with Toelke's pen and then the certificates of acknowledgment with his own pen, and dated the lease June 13, 1922, and the certificate August 23, 1922.

Toelke testified that in 1928, having learned that the Sebeks had

given a lease to someone else to mine within 200 yards of the house, he went to see Mr. Sebek and asked ''about the mistake being made, in place of being 200 feet it was 200 yards;'' that the latter said, ''Yes, it was a mistake;'' and that he (Sebek) wrote the company for it to be corrected. If Sebek admitted that there was such a mistake and wanted it corrected, why was it necessary to commence this suit almost immediately—July 9, 1928? If Sebek had written the company expressing a desire to have the alleged correction made, why was not the letter produced at the trial or accounted for? And if Sebek was cognizant all the while that he had given Toelke a lease which covered all his land up to within 200 feet of his buildings, instead of within 200 yards of them, why did he thereafter lease to another a clay pit lying outside of the 200-foot limit, as Toelke's testimony implies he did? This testimony as to Sebek's admission taxes credulity.

Again, Toelke testified in effect that the lease, owing to the 200-yard clause, did not cover any clay pit at all; that the clay pit shown him by Sebek just prior to the making of the lease was the only one on the land. This, if true, supports appellant's contention that the lease as drawn, because of the alleged mistake therein, fails to effectuate the sole purpose the parties intended to accomplish by entering into it. But Toelke is contradicted at this point. First by the broad implications of the lease itself, which covers all of the Sebek land, and second by appellant's counsel in open court. While plaintiff's witness, Remmert, was on the stand, the court asked: ''The fire clay pit covers thirty or forty acres, doesn't it?'' In response to this plaintiff's counsel said, ''It covers all of his land, your Honor.'' If the clay pit which had been pointed out to Toelke by Sebek had been the specific subject of the grant is it not strange that the parties did not survey and mark it off, so that it could be accurately described in the lease? Certainly some care would have been taken to ascertain whether it lay within 200 yards of a building and the lease drawn accordingly.

It may be true that both Toelke and Sebek intended that the particular clay pit just referred to should be included in the lease. But, even so, it does not follow that the lease as written does not correctly set forth the contract actually entered into by the parties. They may have assumed that the pit was not within 200 yards of any building, for at the time of making the lease neither knew its distance in feet from the buildings, and no measurements were made. And if the lease was written just as the parties intended it should be written, that is, correctly embodies the terms of the contract actually entered into, there is no ground for its reformation. ''A contract cannot be reformed for a mistake not in the contract itself or in the writing embodying it, but of an extrinsic fact which, if known, would

probably have induced the parties to make a different contract." [23 R. C. L. 321; 10 Lea (Tenn.) 406.] In other words, the court cannot supply an agreement that was never made. [Tesson v. Insurance Co., 40 Mo. 33.]

A written instrument may be reformed in equity, on the ground of mutual mistake of the parties, when the mistake is admitted, or upon sufficient proof, both as to the agreement actually made by the parties and as to the mutuality of the mistake in stating in the instrument a different agreement. But the proof must be clear, cogent and convincing. Courts of equity do not grant the high remedy of reformation upon a probability, or even upon a mere preponderance of the evidence, but only upon a certainty of the error. [Employers' Indemnity Corp. v. Garrett, 38 S. W. (2d) 1049, 1054, and authorities cited.] The proof in this case falls far short of the requirements just indicated.

It follows that the judgment of the circuit court must be affirmed. It is so ordered. All concur.