REMI KRICK, and ILLINOIS FEDERATION CORPORATION, a Corporation, Plaintiffs-Respondents, v. FRANCES C. THOMPSON ET AL., Defendants-Appellants.—162 S. W. (2d) 240.

Division One, April 16, 1942.

Rehearing Denied, June 3, 1942.

*Langdon R. Jones* for appellants.

*Hal H. McHaney* for respondents.

HYDE, C.—This is an action to quiet title to land in Section 22, Township 17, North, Range 9, East, in Dunklin County, with a second count in ejectment. Only the answer of defendant Frances C. Thompson (hereinafter called defendant) is in the record. Her answer denied plaintiff's title and right to possession. Her answer also contained a cross bill in equity seeking reformation of her deed conveying this and other land to plaintiff Illinois Federation Corporation (hereinafter called plaintiff, as the other plaintiff merely took title under tax sales for the Federation) on the ground that there was an agreed boundary line between the land conveyed and other land retained by defendant; and that there was a mutual mistake in the deed if it described land beyond such line. The court found against defendant on the cross bill and entered judgment for plaintiff on both counts. Defendant appealed from the court's decree.

The principal fact question was the location of the section line between Section 22 and Section 27. (The north line of Section 27 and the south line of Section 22.) Defendant claimed that this line was the county road running east from the Little River drainage ditches. Plaintiff claimed and the court found, that the line was south of this road, 470 feet at the west side of the Southeast Quarter of Section 22, and 540 feet wide at the east side of said tract, as located by its surveyor Mr. Spiker. Thus it was found that the county road did not run due east and west, and that about 30 acres of the Southeast Quarter of Section 22 lay south of the county road. This is the disputed tract.

The county road was authorized in 1918. It commenced at the Dunklin-Pemiscot County line in the township east of the one involved

in this case. It was authorized to be laid out on the line between Sections across that township until it reached the Deering Ditch, which ran southwest out of that township into the township herein involved. The road there jogged to the north to get across this ditch, then came south again to the line between Sections 24 and 25 of the township herein involved (2 sections east of the sections where the disputed tract is located), and was to run "west along the section lines to intersect the Kennett-Hornersville road at Cotton Plant." These sections were originally surveyed by the United States Government in 1847. However, the township was not completely surveyed then because the "Swamp called Little River" covered all of what is now Section 27, most of what is now Section 22, and a considerable portion of the adjoining sections, being about two miles wide at this point. In 1878 the government surveyed Little River Swamp. In order to connect the sections previously surveyed on the higher land, it was necessary to make some of the sections in the swamp cover more than 640 acres and to make some of the lines so that they did not run due north and south or due east and west. This complete government survey was in evidence. Section 27 is a standard 640-acre section. However, Section 22 north of it contains much more than 640 acres, being one mile north and south but almost a mile and a half east and west. The south line of Section 22, taking in this extra half mile from the Northwest Corner of Section 27 to the Southwest Corner of Section 22 does not run due east and west but bears to the northwest.

Therefore, it was not possible for the county road to run due east and west on these section lines all the way to Cotton Plant, located on the west side of the present Little River Drainage Ditches, which now run southwest through Section 22. All of the maps and plats in evidence indicate that the county road follows the direction of the south line of Section 22, in a southeasterly direction from Cotton Plant, and does not run east and west until after crossing the Little River Drainage Ditches, and that it then turns rather sharply to the north before it continues in an easterly direction across the rest of Section 22. However, whether or not it is ever on the south section line thereafter, or whether it then runs due east and west rather than bearing to the northeast, are disputed questions of fact in this case. As hereinabove stated, the court found that plaintiff's survey was correct in showing that this road was north of the section line and did bear to the North of East along the land in controversy.

It was shown that when this county road was laid out the land in Section 27 was owned by the Hemphill Lumber Company. The land was all in timber at that time and the road was cut out 30 feet wide through the timber on a blazed line. Hemphill's grantor, Mr. Vardell, testified that he and Mr. Langdon, who then owned the Southeast Quarter of Section 22, decided that the correct location of the Section Corner (Southeast Corner Section 22, Northeast Corner Section 27),

was at a place marked by a pump pipe with a doorknob in it. Mr. Vardell said ''it was established by Mr. Langdon and the St. Louis Union Trust Company;'' that Mr. Langdon showed it to him; and that this corner, so marked, was where the county road was established. Apparently the line for the road was blazed from that point. The road was cut out to full 60 feet in width a year or two later. It does not appear just when the surrounding country was substantially cleared of timber.

There seems to be no doubt that the county road was very generally considered to be the section line through this part of the section. In May, 1925, the owner of Section 27, who derived his title through the Vardell-Hemphill chain, conveyed to School District No. 53 of Dunklin County two acres in the Northeast Corner of Section 27, and the School District took possession of a tract of land which was in Section 22, according to the later surveys. The school was built on this tract and was thereafter used by the School District and still is so used. However, in 1926 a survey was made by Mr. Randol, who was then County Surveyor, in which he found the section line to be a considerable distance south of the county road. A copy of the Randol survey was not produced, but Mr. Randol's recollection was that the section line was established about eight chains south of the road. Mr. Randol, testified that Earl Thompson (defendant's husband's grantor) knew about this survey. Mr. Randol also said that he marked the corners on the line he established and that he thought the Spiker plat was a fair representation of the way he ran it. It was also shown that the first house on the south side of the road, in Section 22 as found by the court, was built by a man who became the owner of Section 27 in 1920. This house was later moved, but other houses, barns and buildings were likewise built in Section 22 by subsequent owners of Section 27. Some of these were built by defendant's husband and some by defendant even after notice of the Spiker survey. The type of construction and character of these buildings was not shown.

In February, 1930, Earl Thompson obtained title to the Southeast Quarter of Section 22. At that time he borrowed $75,000 from plaintiff and gave a trust deed on this land to secure its payment. Defendant's husband, Hope Thompson, was plaintiff's attorney and general manager. Immediately after this trust deed was filed for record and on the same date Earl Thompson conveyed to Hope Thompson an undivided one-half interest in all of the land conveyed by the deed of trust subject to the lien thereon. In December, 1930, Earl Thompson made a quitclaim deed to Hope Thompson conveying to him all of his interest in the entire tract. In April, 1931, Hope Thompson conveyed all of this land to defendant. Hope Thompson died June 12, 1931, and this latter deed was put on record by defendant 10 days after his death. Hope Thompson also became the owner of Section 27 (which was not covered by plaintiff's trust deed) by deeds dated April

18, 1930, May 26, 1930, and October 4, 1930. He conveyed all of Section 27 to defendant by deed dated May 28, 1931. This deed was also recorded after his death. Thereafter, plaintiff started foreclosure of its deed of trust. On February 12, 1932, plaintiff and defendant made a contract of settlement. This contract provided that defendant was to have all 1931 crops raised on the land, and proceeds of crops then in the hands of a receiver, and that plaintiff would purchase from defendant at a specified price certain stock in the Federation Corporation held by the defendant as executrix of the estate of Hope Thompson.

This contract further provided:

"Frances C. Thompson shall immediately proceed to obtain a release and quitclaim of all the right, title and interest of the said Earl C. Thompson and his wife, May E. Thompson, in the said premises, located in Dunklin County, Missouri, encumbered by said Corporation's Seventy-five Thousand Dollar ($75,000.00) mortgage, and when procured will convey or cause to be conveyed, all of Earl C. Thompson's and May E. Thompson's own right, title and interest, and all Frances C. Thompson's own right, title and interest in said premises, vesting a complete title thereto in the said Corporation, but subject to the lien of said mortgage and of all outstanding liens for general taxes or drainage tax assessments, but free of all liens or charges on the same against the said Earl C. Thompson, Hope Thompson, or Frances C. Thompson, subsequent to said mortgage."

Defendant testified concerning this settlement contract, as follows:

"Q. You know under this agreement you agreed in writing to convey to Illinois Federation Corporation all of the property described in that mortgage, didn't you? A. Everything Earl had conveyed to me. Q. And everything that was described in that mortgage. You didn't want to convey property not described in the mortgage did you? A. No. Q. And you did want to convey everything described in the mortgage, didn't you? A. Yes. You understood they could foreclose and take the property described in the mortgage by foreclosure, didn't you? A. Yes. Q. You likewise knew no part of Section 27 was described in the mortgage, didn't you? A. Yes. Q. You knew that all of the southeast quarter of Section 22, Twp. 17 N., R. 9 E. was described in the mortgage, didn't you? A. Yes. Q. You signed it, and when you came down and saw the property you thought that this county road was on the true section line dividing Sections 22 and 27, didn't you? A. I presume so. I thought it was the dividing line. I didn't think of it in sections. Q. You thought it was the section line, didn't you? A. Yes. Certainly. Q. And that is the reason why you thought you owned up to the road, isn't it? A. Yes. Q. You never had any intention of claiming land legally belonging to the Federation, did you? A. No. Q. You intended to convey to this company every acre they were entitled to under the mortgage, didn't you? A. Yes."

After defendant made this deed, in 1932, plaintiff took possession of

the land north of the road, and defendant remained in possession of the land south of the road. In 1935 the State Highway Department made a survey, for a new road, which showed the old road to be located in Section 22 some distance north of the section line. Thereafter, plaintiff employed Mr. Spiker, an engineer, to survey its land and his survey showed that the line was south of the old road, 470 feet at the West side of the Southeast Quarter of Section 22 and 540 feet wide at the East side. Thereafter, defendant, who owned all of Section 27, bought the land owned by the General American Life Insurance Company, south of the old road in the Southwest Quarter of Section 22. It was also shown that the owner of the Southwest Quarter of Section 23, east of the tract herein involved, took possession of the land in that section south of the old road down to the section line as established by Mr. Spiker. Plaintiff also offered in evidence a United States Government aerial map made in accordance with findings of United States engineers engaged in floodway work, which showed that the old road was north of these section lines. This suit was commenced in March, 1936, but was not tried until August, 1940.

Since the case was converted to equity by defendant's cross bill, we are not bound by the trial court's findings of fact. However, the evidence seems to overwhelmingly show that the county road is north of the north line of Section 27 and that the land in controversy is in the Southeast Quarter of Section 22. We, therefore, hold that the court was fully warranted in finding the line established by the Spiker survey to be correct. We defer to this finding and adopt it as ours.

The court also further found as follows:

"The Court finds and believes and is convinced that each of the parties mistakenly deemed the county road as true dividing line between Sections 22 and 27 at the time of defendant's deed to plaintiff and continued in such mistake of fact until the State Highway Survey was made. . . .

"The Court finds as between these parties that there was not any expressly agreed boundary line, and finds that the mutual mistake was not in the legal description contained in the deeds but was a mutual mistake of fact as to the extent of boundaries conveyed by the deeds to the actual boundary line. And the Court is of the opinion that on such state of facts the Court can grant no relief to defendant."

Defendant had never been in Dunklin County prior to the death of her husband, and had no knowledge of agreed boundary lines (if any) between former landowners. She then held and immediately recorded deeds to all the land from her husband, who held title to all of it. Thus, when she conveyed to plaintiff, she owned all of Section 27 and the Southeast Quarter of Section 22 north of it; the entire tract on both sides of the county road over this half mile. This court said, in Patton v. Smith, 171 Mo. 231, 71 S. W. 187, where there was a claim

of an agreed line between former owners, "nevertheless, when Remelius (the common source of title of both parties) became the owner of both tracts of land, all such questions became immaterial." The court further held therein that, when a line was erroneously fixed in an attempt to locate the true line, it was not necessarily an agreed line even in an adverse possession case. [See also Tidwell v. Waldrup, 347 Mo. 1028, 151 S. W. (2d) 1092.] Here the evidence was at least conflicting as to whether the road was established by mistake or by agreement, and there was no issue of adverse possession involved. Certainly, under the circumstances shown in this case, the court was warranted in finding that, "between these parties, there was not any expressly agreed boundary line." We, therefore, defer to this finding and also adopt it as correct.

This leaves only the issue of reformation on the ground "that the inclusion of such lands (south of the road) was the result of mutual mistake and a mutual mistake of both parties to said deed as to the true location of said section line." Upon this issue of reformation, we do not think the equities favor defendant. [See 53 C. J. 923, sec. 29 et seq.; for a case where the equities did favor reformation see Phillips v. Cope (Mo.), 111 S. W. (2d) 81.] This was not a bargain and sale transaction, in which the parties negotiated for land within specifically understood boundaries at a certain price and the deed failed to comply with the contract actually made because of mutual mistake in describing the land agreed upon as sold. [Which was true in Fischer v. Dent, 259 Mo. 86, 167 S. W. 977, cited and relied upon by defendant.] Instead, defendant only conveyed what was already mortgaged to plaintiff, which was exactly what she agreed to convey; and also was exactly what plaintiff would have obtained under the foreclosure proceedings, already pending when defendant made the agreement to convey it. There was no evidence to show the value of the land, if any, above the debt. Moreover, defendant's husband, who was plaintiff's manager and agent, made this loan for plaintiff and made it on land in which he was to own a half interest, without plaintiff having any knowledge of that fact. Apparently, it was from the proceeds of the loan secured by this trust deed that he and Earl Thompson were able to acquire the land. Would a court of equity have reformed this trust deed for Hope Thompson against plaintiff? Defendant only succeeded to his interest subject to plaintiff's trust deed. (Earl Thompson had conveyed his title but apparently retained some interest because his consent to the conveyance to plaintiff was required.) This trust deed covered the entire Southeast Quarter of Section 22. It is true that defendant did not know where the south boundary line of Section 22 actually was; and was mistaken in her idea about the location of it. (As was true of plaintiff until surveys were made.) However, there was no intention on the part of defendant to convey less nor of plaintiff to receive less than

all of the land covered by the trust deed, which was the entire Southeast Quarter of Section 22.

Furthermore, the authorities do not support defendant's claim. This court ruled in General Refractories v. Sebek, 328 Mo. 1143, 44 S. W. (2d) 60, where reformation of a lease was sought to include a clay pit outside the description (which fixed the boundaries of land leased at 200 yards from any buildings), as follows:

"It may be true that both Toelke and Sebek intended that the particular clay pit just referred to should be included in the lease. But, even so, it does not follow that the lease as written does not correctly set forth the contract actually entered into by the parties. They may have assumed that the pit was not within 200 yards of any building, for at the time of making the lease neither knew its distance in feet from the buildings, and no measurements were made. And if the lease was written just as the parties intended it should be written, that is, correctly embodies the terms of the contract actually entered into, there is no ground for its reformation. 'A contract cannot be reformed for a mistake not in the contract itself or in the writing embodying it, but of an extrinsic fact which, if known, would probably have induced the parties to make a different contract.' [23 R. C. L. 321; Webster v. Stark, 78 Tenn. (10 Lea), 406.] In other words, the court cannot supply an agreement that was never made. [Tesson v. Insurance Co., 40 Mo. 33, 93 Am. Dec. 293.]"

So here, what is sought is not reformation to substitute a contract actually made for one erroneously described, but instead, it is reformation to make a new contract in place of the one actually made and which is correctly stated. [53 C. J. 925, sec. 34; for statement of usual rule see Lauffer v. Smith, 337 Mo. 22, 85 S. W. (2d) 94.] Clearly the contract made was to convey the land described in the plaintiff's trust deed. Therefore, plaintiff should not now be held entitled to less under defendant's deed in settlement of the foreclosure than it had under its trust deed and would have had under its foreclosure. There is no evidence upon which a reformation of the trust deed could have been based, and no such claim was made. It is apparent that there was at least some doubt about the road being the section line from the time of the Randol survey in 1926. There is evidence that Earl Thompson knew about this before he executed the trust deed. Whether or not Hope Thompson had any information about the Randol survey does not appear. In either case, he did not execute the trust deed but took only subject to it as did defendant. We, therefore, hold that the trial court properly denied reformation.

The decree is affirmed. *Bradley, C.,* not sitting; *Dalton, C.,* concurs.

PER CURIAM: The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.