The CITY OF WARSAW, In the County of Benton and State of Missouri, Plaintiff-Respondent,

v.

G. C. SWEARNGIN and Anna Mae Swearngin, Defendants-Appellants,

William D. Lay and Mary Lay, Administratrix of the Estate of Ella Lay, Deceased, Third-Party Defendants-Respondents.

No. 45227.

Supreme Court of Missouri.

Division No. 1.

Nov. 12, 1956.

**176**

Vernon Frieze, Warsaw, Crawford & Harlan, Earl T. Crawford, Sedalia, of counsel, for appellants and third-party defendants.

F. M. Brady, Edwin F. Brady, Warsaw, William D. Lay, Springfield, for respondents.

HOLLINGSWORTH, Presiding Judge.

The City of Warsaw instituted this action against G. C. Swearngin and Anna Mae Swearngin, husband and wife, to establish the city's title to a narrow strip of land extending along the east (left) bank of the Osage River. The petition alleged that the property was deeded to it as a part of a public park lying immediately north of the City and sought to enjoin said defendants from trespassing thereon and to recover damages for prior trespasses. Said defendants answered claiming title to the real estate and, on their motion, Ella Lay and William D. Lay were made third party defendants, against whom the defendants Swearngin filed a third party petition alleging that they (the Swearngins) took and held title to the land in controversy under a general warranty deed executed by defendant William D. Lay, who had acquired title thereto pursuant to a general warranty deed from defendant Ella Lay, and praying that if it be determined that the City of Warsaw was the owner of said land, defendants Swearngin have judgment against the defendants Lay for their loss. Each of the third party defendants, Ella Lay and William D. Lay, filed an answer denying the allegations of the defendants Swearngin and a cross-petition alleging that if the deeds executed by them purported to include the land in controversy, they did not accurately describe the real estate which William D. Lay agreed to convey and the Swearngins agreed to purchase and were the result of a mutual mistake, and prayed reformation thereof. Thereafter, the death of Ella Lay was suggested and Mary Lay as her administratrix was substituted in her stead and adopted her pleadings. Upon trial of the issues to the court, judgment was entered (1) declaring that title to the land in controversy was duly vested in the City, (2) that the deeds executed by the Lays were the result of mutual mistake and that said deeds be reformed as prayed, and (3) that the Swearngins recover the sum of $1 damages and the sum of $100 attorneys' fees and costs of the action from defendant William D. Lay and that they take nothing from the estate of Ella Lay, deceased. The Swearngins have appealed.

They will be herein referred to as "appellants".

James H. Lay, who died in 1932 at the age of 89 or 90 years, is the common source of title. He was commonly known and is referred to in the record as Judge Lay and so shall we refer to him to avoid confusion. The controversy here waged involves, in the first instance, the extent of a strip of land excepted from a deed executed by Judge Lay to the City on November 21, 1907, and recorded on December 18, 1907, and to which strip, subject to the dispute as to its extent, appellants admittedly acquired title through deeds from his successors in title, the respondents Ella Lay and William D. Lay. Judge Lay's deed of November 21, 1907, conveyed to the City, subject to a life estate in himself, for use as a public part the following described real estate in Benton County, Missouri:

> "All of the Northwest fractional quarter and all of the Southwest fractional quarter, both on the left bank of the Osage River, of Section 17, in Township 40, of Range 22, lying west of the present public road and northwest and north of Clay Street in Vaughn's Addition and Chapman's Addition to the original Town of Warsaw, as said street is laid off on the plats of said Additions on file in the office of the Recorder of Deeds of said County; the northwest line of said street to be the southeast side of the tract herein conveyed, and except the part of the above described tracts heretofore conveyed by [James H. Lay] for the Riverside Cemetery, *and except the part of the above described tracts which lie in the Osage River bottom, being what is commonly called 'bottom land', and now enclosed by barbed wire fence, and the Osage River,* the tract conveyed containing about 56 acres."

(The emphasis on the tract last above described as being excepted from the deed is ours.)

In accordance with the provisions of that deed, the City claims ownership of *all* of the land within the aforesaid fractional quarters lying west of the public road and west and north of Clay Street, except (1) certain streets within the area, about which there is no controversy, (2) the cemetery tract located at the extreme northeast corner of the tract, about which there is no controversy, and (3) "the part of the above described tracts which lie in the Osage River bottom, being what is called 'bottom land' and *now* (on November 21, 1907) *enclosed by barbed wire fence, and the Osage River.*" (Again the emphasis and the date inserted are ours.) Determination of the extent and exact location of the "bottom land", as it was enclosed by the barbed-wire fence on November 21, 1907, will determine the rights and respective titles of the City and the appellants. There is no dispute as to the north and east and west lines of that tract. Admittedly, it was bounded on the north by the north line of Section 17, on the west by the east (left) bank of the Osage River and on the east by a line of bluffs, which, due to irregularities in conformation, was varying distances (apparently never exceeding 250–300 feet at the widest point) to the east of and, in general effect, parallel to the east bank of the river. The south line of the tract of bottom land is the "bone of contention". The City (and respondents Lay) contend that the south line was bounded by a barbed-wire fence extending between the bluff line and the east bank of the river, which fence (as shown by a plat made at the instance of and introduced in evidence by the City) was approximately 2,120 feet (measured along the meanderings of the bluff line) south of the north line. The tract, as thus measured by the City, contains an estimated eleven acres. The appellants contend, however, that when Judge Lay executed the deed to the City the south line of the bottom land tract excepted from the deed was located at Clay Street (the south line of the tract conveyed by Judge Lay to the City), about 1,235.5 feet (measured by the meanderings of the

bluff line) further south than the line asserted by the City to be the south line of the bottom land. If the appellants are correct in their contention, they became the owners of an additional strip of land containing three or four acres extending on southward between the bluffs and the east bank of the river, lying below the south end of the tract the City and the respondents Lay contend appellants obtained from respondent William D. Lay. If, on the other hand, the City is correct in its contention as to the location of the south line, then appellants did not and could not obtain any title to the strip lying to the south of that line for the reason that Judge Lay had priorly deeded it to the City as a part of the public park.

In 1931, Judge Lay, who had continued to own a life estate in the park property which he had deeded to the City and to own the fee in the bottom land excepted from that deed, gave a deed of easement granting to Union Electric Light and Power Company certain privileges incident to the construction and future maintenance of the now well-known Union Electric Dam. (The City also made a settlement with Union Electric for all damages to the land in dispute.) The description in the easement deed executed by Judge Lay, obviously prepared at the direction of Union Electric, includes not only the land that the City and respondents Lay admit appellants got in their deed from William D. Lay, but also includes the land to the south thereof claimed by appellants.

Upon the death of Judge Lay, the title to the bottom land excepted from the deed to the City (subject, of course, to the easement granted to Union Electric—as were all subsequent transfers) passed under his will to his son, Henry P. Lay, wherein it was referred to as "about eight acres of bottom land". Thereafter, through conveyances that shed no light on the issues here involved, title to the tract as "now enclosed by barbed wire fence" passed to respondent Ella Lay. Ella Lay conveyed to respondent

William D. Lay and he conveyed to appellants, in both of which deeds the scrivener used the descriptions found in the deed of easement taken by Union Electric. (It is well to here note that due to the meanderings of the bluff line the descriptions in these deeds contain sixteen or more compass and distance calls, which only an expert in surveying could intelligently read and apply to the land described.)

One of the contentions made on this appeal is that the evidence was wholly insufficient to sustain either the judgment in favor of the City or the judgment in favor of the respondents Lay. The evidence shows that the fence enclosing the south line of the bottom land has long since disappeared and proof of its location was largely dependent upon the memory of witnesses who had known its location. Some of the testimony is unintelligible to a reader of the record, due to the fact that both witnesses and counsel frequently referred to points or locations on a plat in evidence by merely pointing to them, or they discussed landmarks, such as inlets, roads, table rocks, swimming holes, et cetera, the location of which, as between them, apparently was understood, but which cannot be understood from the transcript. But the record suggests and respondents' brief unequivocally asserts that the trial judge viewed the land in controversy and undertook to and did determine the location of the south line fence to be as contended by the City and the respondents Lay. If so, he was, of course, far more able than this court to understand the full import of such testimony. The testimony of the witnesses, to the extent it is pertinent, clear and readily understandable, will be herein narrated.

James A. Lay, aged 57 years, a lawyer, grandson of Judge Lay and the father of respondent William D. Lay, testified: He had intimately known all of his life the land occupied by the City Park and the bottom land excepted from the deed given by his grandfather to the City. The bottom land was usually planted to corn and both the north and south ends were fenced to keep

livestock out of it. Until the Union Electric dam was built in 1930 or 1931 and the water backed up, there was a spring and some trees south of a barbed-wire fence enclosing the south end of the tract. The bluff "took care" of the fencing on the east side and the river bounded the west side. The tract of bottom land within the enclosure thus fenced was said to contain ten acres. All of the land lying outside of the enclosed tract was a part of the City Park. In October, 1953, respondent William D. Lay, son of the witness, was in the military service and the witness, in behalf of his son, who then owned the bottom land excepted from Judge Lay's deed to the City, negotiated with appellant Guy C. Swearngin for the sale of the bottom land to the Swearngins. Witness and Mr. Swearngin drove up near the tract. They stopped at the point on the road where it turns off from the park road and walked up (northward) to where the spring had been and across where the old (south line) fence used to be near the spring. Witness was unable to tell Mr. Swearngin exactly where the fence had been, but he knew reasonably well where it used to be. He told Mr. Swearngin the barbed-wire fence which formerly enclosed the south end was just a little above (north of) the spring. As the witness recalled, Mr. Swearngin asked him if the tract extended below (south of) the fence and witness told him it did not. Sometime thereafter, witness and Mr. Swearngin went to the office of Robert Drake to have a deed made. Witness thinks the matter of the exact quantity and kind of the land that he was selling in behalf of his son came up and that he repeated that nothing was to be conveyed south of the old fence. The consideration of the sale was $300, which was the then fair market value of the tract lying north of the line of the old fence. After the deed was drawn, witness looked at it and saw that it was a long metes-and-bounds description and did not read it. Mr. Swearngin was in no way responsible for the description set forth in the deed.

Nathan Brown, county surveyor, testified: At the instance of the City, he made the plat introduced into evidence by the City. At a point on that plat there is a line marked across the bottom land from the bluff line to the east (left) river bank with a notation entitled, "Location of original fence as indicated by old wire and testimony of older residents". That line was run at the direction of the City. There was a piece of barbed wire on a tree on the bluff side of the land at that point showing where there had been a fence. Witness ran the line from that point westwardly across the bottom land 120 feet to a sycamore tree stump on the east river bank on which there was the marking of a barbed wire on the upstream side, that is, a loose end of wire stuck out from the tree toward the river. There was also indication of a fence on top of the bluff extending not more than eight or ten feet northerly from where he ran the line westward across the bottom land to the old sycamore stump. He saw no indication of any fence south of that line.

Mary Lay, a daughter of Henry P. Lay and a granddaughter of Judge Lay, testified: She was an ex-schoolteacher and an ex-abstracter. She remembered that the fence enclosing the south side of the field was above the spring and that neither her father, to whom Judge Lay had devised the bottom land, nor her mother after her father's death, had ever claimed any of the land south of that fence.

Respondent William D. Lay, aged 25 years, a lawyer residing in Springfield, Missouri, testified: He deeded the bottom land formerly owned by his great-grandfather, Judge Lay, to appellants. The sale was arranged through witness' father, James A. Lay, while witness was in the military service. Witness signed the deed but had nothing to do with its preparation. He intended to convey only the land that his great-grandfather had not deeded to the City. He had no personal knowledge concerning the former location of fences. On cross-examination, witness said that he certainly did not

recall looking at the deed in Mr. Swearngin's office after the lawsuit was instituted and saying to him that the deed was exactly right.

Robert S. Drake, aged 52 years, an abstracter, testified: He has known the City Park and the bottom land adjacent to it all of his life. The park was used as a cow pasture by Judge Lay and there was also a baseball diamond and picnic ground on it. Witness remembers the enclosed bottom land along the river. It was usually planted to corn. Before reaching the enclosure, there was a spring out of which cows pastured in the city park by Judge Lay and others drank. People visiting in the park also drank from the spring. The field was fenced off from the pasture and the spring. The fence was at the south end of the field and on the east side of it. Mr. Swearngin and Mr. Lay discussed with witness the making of a deed. He obtained the description from either William D. Lay's deed or from a description he found in the abstract.

A. J. Ferguson, aged 70 years, testified: He has known the land in controversy for many years. The field (bottom land) was fenced off. The fence went across the south end and about a year ago witness found the sycamore stump with the wire nailed to it. The fence was above (north of) the spring.

Joe Yeager, aged 59 years, testified: He used to work for Judge Lay and knew the location of the fence across the south end of the bottom land and worked on it when he worked for Mr. Lay. The spring was at the foot of the road that came down the hill to the field and the fence was on up the river. The river bottom was about 40 steps wide at the fence. (The plat shows it to be 120 feet.)

G. R. Bresee, aged 53 years, serving his third term as Mayor of the City of Warsaw, testified: He used to swim in the river at a point near the south fence of the bottom land. It was a barbed-wire fence and was attached to a tree near the river. Its purpose was to keep livestock that ranged on the park out of the field.

Roy Burton, city marshal, aged 62 years, testified: He had known and attended picnics at the City Park since he was a boy and was familiar with the "corn field that Judge Lay had". The spring was about 40 or 50 feet up (north) from the "bottom of the road" and the south fence of the corn field was further on up (north) of the "bottom of the road".

The evidence in behalf of appellants consisted of the testimony of three witnesses, the deed from respondent William D. Lay, and an opinion of F. M. Brady, attorney at law, as to the title to the land claimed by appellants, which latter exhibit sheds no light on the issues.

The testimony of appellants' witnesses is difficult to follow, but we accept their summary of it as correct. According to that summary, W. W. Thorne testified: He was employed by the Union Electric Company to survey fences which were below flood stage and that wires in trees along the bluff indicated that a wire fence had run from the point of flood stage to the cemetery. And Eaf Rank testified: His father and he farmed said bottom land ten or twelve years from and after 1932; that he and his father decided where to and built a fence across the bottom from the bluff to the river; that they kept said fences in repair and that a wire fence ran from Hughes Camp (Clay Street) to the cemetery.

Mr. Swearngin testified: When James A. Lay and he inspected the land, Mr. Lay said that he was not sure where the boundary lines were and that he (Mr. Swearngin) would have to take whatever the deed called for; that the south line was below the spring, but that he did not know how far below it; that Mr. Lay instructed Mr. Drake to draw up the deed and bring the abstract to date; that he (Mr. Swearngin) and his wife cut brush off part of the survey line and found two rusty barbed wires along said survey line, both above and below where a road enters the bottom; that said fence runs from Hughes Camp (near Clay Street) to the cemetery; and that after the dispute as

to boundary arose, William D. Lay came into his place of business and asked to see the deed, inspected it and approved it as written.

We agree with appellants that the burden of proof rested upon the City to establish its claim of title to the strip of land lying south of the south line of the bottom land as it contended that line existed when Judge Lay executed the deed to the City on November 21, 1907, Railsback v. Bowers, Mo., 257 S.W. 119; Williams v. Pemiscot County, 345 Mo. 415, 133 S.W.2d 417, but we cannot agree that the evidence is so uncertain and indefinite as to render the judgment void.

Extrinsic evidence is always admissible to explain boundary calls and to apply them to the subject matter and thus give effect to a deed. While it is true that a deed must describe land so that it can be identified, yet that is certain which by evidence aliunde can be made certain. Hubbard v. Whitehead, 221 Mo. 672, 121 S.W. 69, 71; Kleine v. Kleine, 281 Mo. 317, 219 S.W. 610, 611, 8 A.L.R. 1335; Stith v. Post, Mo., 232 S.W. 985, 986. See also Hammond v. Johnston, 93 Mo. 198, 214–218, 6 S.W. 83; Worthington Drainage District, etc. v. Davis, 235 Mo.App. 949, 151 S.W.2d 469, 471. Houses and fences may be and often are used as monuments of boundaries and, when so used, their removal or destruction does not affect the land or destroy its identity if the location of such monuments may be otherwise established. Whitwell v. Spiker, 238 Mo. 629, 142 S.W. 248, 251; 11 C.J.S., Boundaries, § 108, p. 704.

Several witnesses who had known the tract of bottom land as it was enclosed by a barbed-wire fence in the years prior to the building of the dam testified positively that the location of that fence was north of the spring and one of the witnesses identified the sycamore tree to which it was attached on the side abutting the river bank. The finding of barbed wire attached to a tree on the bluff side and to a sycamore tree on the river bank opposite the tree on the bluff side, when considered in connection with the well established fact that these monuments were north of the spring and in the immediate vicinity of the fence as it formerly existed, warrants an inference that the fence enclosing the southern boundary of the bottom land excepted from Judge Lay's deed to the City was located at the point shown by the aforesaid monuments. Especially is this true in the absence of any evidence that the fence was located elsewhere in that vicinity. The judgment of the trial court on that phase of the case is supported by competent and substantial evidence and is affirmed.

Appellants next contend that the trial court erred in reforming the deed of William D. Lay so as to exclude the land in dispute (that lying south of the fence line as shown by the City's and respondent Lays' evidence) on the ground that the finding of the court upon which it predicated the decree of reformation is contrary to the evidence and the weight thereof.

It is, of course, true, as appellants assert, that a court of equity cannot, under the guise of correcting a mutual mistake in a deed, declare or make and enforce as a contract or deed one that is not predicated upon a prior and definitely understood agreement. Krick v. Thompson, 349 Mo. 488, 162 S.W.2d 240, 245 [5]; Feeler v. Gholson, Mo., 71 S.W.2d 727, 729 [4]. It is also true that a court of equity will not grant reformation of a deed on the ground of mutual mistake when the evidence is not so clear and cogent as to convince the chancellor, as some of the cases say, beyond a reasonable doubt of the mistake and its mutuality. Feeler v. Gholson, Mo., 71 S.W.2d 727, 728; Van Eaton v. Dennis, Mo., 242 S.W.2d 21, 25. And, on appeal from the decree of a court of equity reforming a deed, it becomes the duty of this court to consider the evidence de novo and to reach our own conclusions. But in such cases, when the issue of fact presented has been decided upon conflicting oral evidence, due defer-

ence must be accorded the finding of the chancellor and his finding will be sustained unless the proof is palpably insufficient in clarity and cogency to warrant the finding made by him. Sec. 510.310 RSMo 1949, V.A.M.S.; Taylor v. Baldwin, 362 Mo. 1224, 247 S.W.2d 741, 751; Miller v. Coffeen, Mo., 280 S.W.2d 100, 101.

As stated, there was substantial evidence that the south line of the tract excepted from the deed given by Judge Lay to the City lay immediately north of the spring at the point shown on the plat introduced in evidence by the City. The evidence in behalf of the City and respondents Lay further tended to show that both the City and respondent Lay recognized and treated the south line as being so situate from the time the deed to the City was executed and that never thereafter did any interested party assert otherwise until the appellants obtained their deed carrying the description used in the deed of easement given by Judge Lay to Union Electric. Appellants, however, place great stress upon the description in the easement deed and the subsequent use of that description in the deed from Ella Lay to William D. Lay and in the deed from him to appellants. But the circumstances under which the deed of easement was executed tend to explain the description therein used in such manner as to rob it of the significance attached to it by appellants. Judge Lay, as stated, had reserved a life estate in the whole tract between the east boundary of the tract and the east bank of the river (from Clay Street to the north line of Section 17) except such portion of the bottom land as was enclosed within the barbed-wire fence, to which he reserved a fee. It was inevitable (as the evidence so strongly shows) that the location of the south line of the land excepted by Judge Lay sooner or later would become uncertain, and that the Union Electric could make certain of obtaining the easement it desired to the whole of the bottom land only by taking conveyances from all parties who at that time had any interest whatever in any of the bottom land within the tract.

Those parties were, as the records showed, the City and Judge Lay. As a prudent purchaser, Union Electric took a deed from all of the parties to all of the bottom land.

The evidence also tended to show that appellants were not deceived by that description. To the contrary, the evidence of the City and respondent Lay that when the sale to appellants was being negotiated, Mr. Swearngin and James A. Lay, William D. Lay's agent, went upon the tract and there James A. Lay pointed out to Mr. Swearngin the approximate location of the south line and advised him that no part of the tract lay south of the spring and that Mr. Swearngin agreed to buy the land as pointed out to him. And, although Mr. Swearngin denied that the line was so pointed out to him and testified that James A. Lay said that the fence was south of the spring, the court, who saw and heard all of the witnesses, believed Mr. Lay's version. Under the circumstances thus shown, the court must have concluded that use of the description set forth in the Union Electric deed in the subsequent deeds of the respondents Lay was inadvertent.

■ We hold that the evidence warranted a finding that the description in the deed from William D. Lay to appellants was the result of mistake and that William D. Lay did not agree to convey and Mr. Swearngin did not purchase any bottom land lying south of the line shown by the evidence of the City and respondents Lay.

■ But, appellants say that inasmuch as the deed was drawn by Robert S. Drake, who acted as the sole agent of the grantor, William D. Lay, there can be no reformation because there was no showing of mutuality of mistake. In support of that contention, they cite: Stephens v. Stephens, Mo., 183 S.W. 572; Dougherty v. Dougherty, 204 Mo. 228, 102 S.W. 1099. Those cases are patently not in point on the facts. The "answer and cross-petition" of William D. Lay alleged (as did the answer and cross-petition of Ella Lay) that William D.

Lay (through his agent, James A. Lay) orally contracted to sell and appellants agreed to buy the bottom land north of the barbed-wire fence (located as the judgment of the trial court found it to be) and that through error and mistake of the scrivener *"and of the parties to such deed"* it was erroneously described (as set forth in appellants' deed). Thus it is seen that although an error of the scrivener is alleged the answer and cross-petition of each of the respondents Lay also allege an intention to convey certain land pursuant to an actual agreement of the parties and that by mutual mistake that was not done, and, as stated, the evidence in behalf of the respondents tended to show that to be the fact. In the case of McCormick v. Edwards, 351 Mo. 1017, 174 S.W.2d 826, 828, we said of a similar situation: "When the mistake relied on is solely that of the scrivener, it must be further alleged and shown that he represented both parties in order to show the mistake to be mutual. But where, as here, it is alleged that the parties intended to convey certain land in accordance with a previous agreement and by mutual mistake failed to do so, the agency of the scrivener is unimportant." The law as announced in that case is applicable to the facts as found by the court in the instant case. And appellants' contention on that score must be denied.

■ Appellants further say that Mrs. Swearngin took no part in the negotiations for the sale and that there was no evidence of any mutuality of mistake between William D. Lay and her. A careful review of the motion for a new trial suggests this to be an afterthought. Suffice to say, however, that by their joint pleadings both appellants asserted ownership of the land claimed by them pursuant to the contract made between *them* and William D. Lay. Under such circumstances, the court was fully justified in concluding that Mr. Swearngin was the agent of Mrs. Swearngin and that the statements and representations made by William D. Lay's agent, James A. Lay, to Mr. Swearngin constituted, in legal effect, statements and representations made to Mrs. Swearngin and that Mrs. Swearngin is chargeable with his knowledge and understanding of the contract. The contention is without merit. McCormick v. Edwards, 351 Mo. 1017, 174 S.W.2d 826, 829 [6, 7].

And, finally, appellants assert that the trial court erred in finding "the issues in favor of [Ella Lay's Estate] on the third party petition filed against her". Perhaps, as between Ella Lay's Estate and appellants, there was no mutuality of mistake, as the trial court did decree, but the matter is definitely moot. When the trial court determined that William D. Lay agreed to sell and appellants agreed to purchase only the land enclosed by the barbed-wire fence and that appellants, in exact accord with their own contract, acquired no title whatever to land south of the barbed-wire fence, but did acquire title to the tract that William D. Lay agreed to sell them, Ella Lay passed entirely out of the picture. Consequently, the judgment dismissing her from any liability under her deed was correct, and the order reforming her deed is of no moment.

The judgment and decree of the trial court should be and is affirmed.

All concur.