**HAMBURG REALTY COMPANY, a Corporation, Respondent,**

v.

**F. Pace WOODS, Olive Black Woods and Lucian Smith, Appellants,**

**Fred Walker, Gertrude Walker, Cecil P. Walker, Olin Engleman and Maye Engleman, Defendants.**

No. 47126.

Supreme Court of Missouri,

Division No. 1.

July 13, 1959.

Rehearing Denied Sept. 14, 1959.

See also 327 S.W.2d 155.

J. M. Gerlash, Tarkio, M. E. Ford, Maryville, for the respondent

Walter L. Mulvania, Rock Port, Moran & James, by Vantine James, Nebraska City, Neb., Martin & Wenger, by Howard B. Wenger, Hamburg, Iowa, for appellants.

HOLLINGSWORTH, Judge.

In this action plaintiff, Hamburg Realty Company, a corporation, sued in Count I of its petition to quiet its alleged fee simple record title to certain island lands situate in the Missouri River immediately south of the Iowa-Missouri state line in Atchison County, Missouri, and in Count II sought possession of said lands. Certain of the defendants, F. Pace Woods, his wife, Olive Black Woods, and Lucian Smith, denied plaintiff's ownership of that portion of the lands claimed by plaintiff which said defendants alleged were adjacent or attached to an area known as Original Woods Island, herein frequently referred to as the Woods Island tract, and affirmatively asserted title, to the lands claimed by plaintiff by (1) accretion to the whole or portion of the orig-

inal Woods Island tract, admittedly owned by them, and (2) by adverse possession. The other defendants, Fred Walker, Gertrude Walker, Cecil P. Walker, Olin Engleman and Maye Engleman, denied plaintiff's ownership of another portion of the lands (known and referred to herein as the Walker-Engleman Island) and asserted title thereto by adverse possession.

By agreement of all of the parties, the issue of ownership of the Woods Island tract was tried to the court and the issue of ownership of the Walker-Engleman Island tract was tried to a jury. Trial of the issue of title to the Woods Island tract resulted in a separate judgment in favor of plaintiff, from which the defendants Woods, Woods and Smith have appealed. Trial of the issue of title to the portion of Walker-Engleman Island tract lying in Missouri resulted in a separate judgment in favor of the Walker-Engleman defendants, from which plaintiff has appealed. Separate transcripts and briefs were filed in this court. Thus, two distinct cases are presented.

This opinion, in which we frequently will refer to appellants Woods, Woods and Smith as though they were the only defendants, treats only of the adjudication of the issue of title to the Woods Island tract.

Prior to the times herein mentioned, the main channel, or at least a substantial part of the main channel, of the Missouri River, as it flowed southward between Nebraska and Iowa, immediately north of the Iowa-Missouri line, coursed along the east bank. However, as the river neared the Missouri line, a number of chutes developed to the southwest, causing parts of the waters formerly flowing in the channel on the Missouri side to be diverted through these chutes westward to and thence southward toward the Nebraska side. Thus, during varying stages of the river's flow in that area, its waters coursed through the wild chutes or entirely covered in times of high stage a general bed width of more than a mile between the outer banks of the river. In order to stabilize the flow of the main channel the U. S. Government, in about 1936, began the construction of a series of dikes south of the Iowa-Missouri line which eventually tended to merge the waters flowing through the wild chutes into one channel that turned westward to the Nebraska side at a point near the Iowa-Missouri line. The channel thus created thereafter coursed along the Nebraska side for a mile or so and thence turned southeastward back toward the Missouri side, where it joined the old channel on the Missouri side. The old channel on the Missouri side thereafter became locally known and is referred to in the evidence and in plaintiff's deed as the "Old Chute".

As the building of the dikes progressed and the flow in the wild chutes lessened, islands formed between the chutes to the south of the new main channel as it coursed westward from the old bank on the Missouri side to the bank on the Nebraska side. In 1937, there were two of these islands, one which became known and is referred to throughout the record as Woods Island; the other which became known as Walker-Engleman Island.

Woods Island is situate approximately midway between the east and west banks of the river. Its shape is similar to that of a plumb bob and it lies as though its upper stem were immediately south of the Iowa-Missouri line, with its lower tip pointed southward downstream. Walker-Engleman Island, lying partly in Missouri and partly in Iowa, is to the northeast of Woods Island and is separated from it by a chute. The entire area covered by the land areas and the chutes and waters separating them is bounded on the north and west by the new main channel and on the east and south by the Old Chute. Said entire area, somewhat similar to a football in shape, lies in a northeast-southwest direction. Its greatest east-west width (near its center) is some mile or more and its greatest north-south length is some two miles.

On July 12, 1939, for a consideration of $242.68, Atchison County conveyed to Clark Pace Woods (the mother of defendant F.

Pace Woods) 194.15 acres of land, more or less, specifically defining the boundaries thereof by precise survey designations. The deed makes no mention of "Woods Island". However, maps in evidence show that the land described in the deed lies on Woods Island and a plat shows it to conform to the general contour of the island as it existed at that time. In July, 1948, Clark Pace Woods (and her husband) conveyed the land to defendant F. Pace Woods and his wife, Olive Black Woods. On December 31, 1956, they conveyed an undivided one-half interest therein to defendant Lucian Smith. On the 11th day of January, 1957, they executed a second deed to Lucian Smith to "an undivided ½ interest in all the land now cleared and now in crop *that is accretion to the land hereinafter described,* * * *"* (Here follows the original description of the 194.15 acres as described in all of the prior deeds.) Plaintiff admits that defendants, as successors in title of the original grantee in the 1939 deed, are the owners of the 194.15 acres of land specifically described therein by metes and bounds.

On June 6, 1950, Atchison County, for a consideration of $766.32 paid to it, executed and delivered to plaintiff its deed to the land to which plaintiff herein asserts title. It purported to convey to plaintiff 613.05 acres of land, more or less, south of the Iowa-Missouri line and west, south and east of the 194.15 acres theretofore conveyed to defendants' predecessor in title.

Plaintiff-respondent's contention is that prior to 1939 sandbars had risen in the river in the area around the tract known as Woods Island, especially to the west thereof, but separate from it; that by deposit of silt and soil (accentuated by dikes constructed by the U. S. Government) these sandbars and other sandbars forming to the south, east and northwest of original Woods Island became islands which, as they gradually enlarged, filled the chutes surrounding Woods Island; that as these islands grew, separate and apart from Woods Island, they became the property of Atchison County; that although they gradually enlarged in some instances until they became immediately adjacent to Woods Island, they are not accretions to it; and that title thereto is vested in plaintiff under its deed from Atchison County.

Defendant-appellants' contention, at trial and on appeal, is that plaintiff acquired no valid record title to the land claimed by it for the reasons (a) that its deed from Atchison County was not shown to have been executed by authority of the County Court and (b) said deed does not describe any ascertainable area or tract of land; that defendants, as successors in title to the original grantee of the 194.15 acre tract, acquired the title to (a) Woods Island as it originally existed and title to all lands thereafter attached thereto as lawfully accreted land and (b) all of the lands surrounding the original 194.15 acre tract (except the Walker-Engleman Island) by adverse possession. They also, on appeal, assert error in the admission of certain evidence.

In the main, the evidence herein consists of some sixty or more maps, aerial and ground photographs, numerous deeds, and the oral testimony of witnesses expressing their respective interpretations of the maps and photographs. In testifying as to locations, courses and distances shown on the maps and photographs, the witnesses were permitted, with some gratifying exceptions, to designate them by pointing to the exhibits and saying "here", "from here to here", "then up (or 'down' or 'this way')to here", etc., few of which designations are shown in the record or marked on the exhibits. While it appears that the trial judge was able to follow the indications made by the witnesses, it is only by tedious and time-consuming study of the exhibits can the appellate court interpret such testimony with any degree of certainty and very considerable portions of it are wholly meaningless to a reviewing court. We set forth that portion of the evidence that can be interpreted by reference to the exhibits, realizing that much of it will be without meaning to the reader who does not

have before him each of the exhibits as the testimony of each of the witnesses given in relation thereto is considered.

*Plaintiff's Evidence:*

Robert Johnson, President of Hamburg Realty Company, testified: The land adjacent to the 194.15 acre tract of defendants, and to which adjacent lands plaintiff claims title, lies east of the main present channel of the Missouri River. Said land is of island formation and has never been connected with the mainland. He had known the land in question since 1950. During all of the time thereafter a chute has run along the west side of defendants' 194.15 acre tract. Within the last month he had "looked over it" and flown over it. The chute, now only about a rod wide, is still plainly visible, but he had not seen water running in it. The 194.15 acre tract was definitely higher than the land west of the chute.

Delmer Broers, a draftsman and engineer's aid, employed in an office of the United States Corps of Engineers at Nebraska City, testified: He had worked in the office of his employer for the last three years and for seven years prior thereto had worked out of that office with survey parties. His experience had taught him to interpret maps made by that department. Shown a map printed by that office in 1945, he pointed out plats superimposed thereon by him showing the 194.15 acres of land admittedly owned by defendants and the lands on the sides thereof claimed by plaintiff; pointed out an active chute, which begins at the new main channel some 1500 feet (the footage distances recited herein are generally rough estimates of the writer) southwest of the north end of the 194.15 acre tract situate on original Woods Island. The chute extends thence generally south for a distance of some 2000 feet, thence eastward 400–500 feet to the west side or bank of Woods Island, thence along the west side of the island to its tip, where it flows into the Old Chute. He then pointed out a non-active chute that extended north from the junction of the above described active chute with Woods Island, in which non-active chute water would "back up", at high river stage, indicating that Missouri River waters once ran through it.

The witness was shown another of said maps, dated 1946–1947, upon which he had superimposed a plat of the 194.15 acre tract and a plat of the lands claimed by plaintiff, and further testified: Printed legend on the map indicated that in 1946–1947 willows were growing on the land claimed by plaintiff between the new main channel and the chute (shown on the map) that coursed along the west side of Woods Island.

The witness was shown an aerial photograph, taken in 1947, upon which he had superimposed plats of the defendants' 194.15 acre tract and the lands claimed by plaintiff, and further testified: Both active and inactive chutes running along the west side of defendants' tract, as shown and described by the witness on the first map, still appeared with marked clarity. At the then stage of the river no water was shown, but at higher stage water would flow in them.

Shown another aerial photograph, taken on August 2, 1954, upon which he had superimposed plats of the areas of defendants' 194.15 acre tract and the lands to the west, south and east thereof claimed by plaintiff, the witness further testified: The picture indicated that sandbars were forming in the chute along the west side of defendants' tract, but when there was high water it would flow through the chute, and the shading in the picture showed the timber growth to be heavier on defendants' 194.15 acre tract than the growth to the west thereof, indicating that defendants' land was of earlier formation than the land claimed by plaintiff.

At this stage of the proceeding, plaintiff formally offered in evidence the exhibits concerning which the witness testified, to which offer defendants objected on grounds that the witness was not qualified to testify

to the facts related by him, and that the drawings superimposed on the exhibits did not correspond to the descriptions in plaintiff's petition or the deed under which plaintiff claimed its title. The court thereupon permitted plaintiff to recall Robert Johnson, president of plaintiff corporation, who testified: In 1939, defendants had a survey of the 194.15 acre tract made. In 1957, after the instant suit was brought, defendants also had a survey made of the lands claimed by them and by plaintiff. Both of these surveys were furnished by Johnson to witness Broers, from which Broers "plotted them" on these maps. The court admitted the exhibits on condition that plaintiff connect up the surveys so made with the testimony of the witness.

Plaintiff thereupon tendered to counsel for defendants plaintiff's exhibit 7, which defendants' counsel conceded to be the survey made for defendants showing the 194.15 acres deeded to them. Plaintiff then recalled witness Broers who testified that exhibit 7 was in his possession when he platted the description of defendants' land on plaintiff's exhibits concerning which he had priorly testified and again pointed out the plats superimposed by him on the maps and photographs. The exhibits were thereafter admitted.

The witness then continued: The plats of the land claimed by plaintiff as platted on said exhibits were made from the 1957 survey made for defendants; and further that other lines superimposed by him on said maps and photographs accurately showed the section lines of Sections 34, 35 and 3, in Townships 67 and 66, Range 43, in Atchison County. The witness then pointed out to the court wherein all of the lands claimed by plaintiff (and defendants) lay within said sections.

Shown another government map, dated May 16, 1939, upon which he had superimposed the Woods Island tract, Broers further testified: Oblong circles appearing on the map to the west of Woods Island and east of the main channel (and within the area of the land claimed by plaintiff) show three sandbar formations. The largest of these lies immediately northwest of Woods Island and south of government dike structures and is separated from Woods Island by a chute. Other sandbars are shown west of Woods Island, close by the new channel, with their east lines several hundred feet west of Woods Island. The witness further identified the location of dikes constructed by Government Engineers which extended from one of these sandbars to the main channel and pointed out small islands immediately south of said structures and near the main channel. Water is shown in the chutes.

Daniel Thornton testified: He was an area engineer for the U. S. Army Engineers Corps from 1933 to 1951, and his job was to inspect the Missouri River, help draw maps and to read maps of work done on the river. Shown a 1946–1947 War Department map, he was referred to land in Sections 34 and 3, at which point he had worked. During the time he worked in that area he had occasion to go over it frequently. When the dikes were built in 1938–1939, the chute was active and the purpose of the dikes was to cut it off. There was then a low bar of land to the west of the chute. The bar land on the west side of the chute was lower than the land on Woods Island.

*Defendants' Evidence:*

Raymond L. Huber, supervisory civil engineer, Corps of Engineers, Omaha District, testified: He is the chief engineer in charge of the Channel Stabilization Division and has been so engaged since 1926. In his work he makes inspection trips on the average of once a month for the purpose of observing the channel and planning the construction work, and has done so on the particular section in question since 1936, which was the date of the commencement of dike construction. Maps of the area in question bearing dates of April 13, 1938, June 3, 1938, July 1938, May 2, 1939, and June 2, 1939, were identified by the witness,

concerning which he testified: Dike 597.-5–A, in April, 1938, extended northeast-southwest from Walker-Engleman Island across the northern end of original Woods Island westward to what was then the main channel, a distance of some 500 feet west of the northern end of Woods Island. Immediately south of the southwest end of the dike was a sandbar. The channel flowed west of that sandbar and then back east toward the west shore of Woods Island and thence along its shore to its southern end where it merged with the old channel (Old Chute). The map of July 1938 showed little change upstream. South thereof the channel had moved westward, then cut back east to Woods Island and then directly south. The map of May 1939 showed a split in the channel, a part of it going to the west as shown on the previous maps and a part of it had cut around the end of the dike and flowed back to Woods Island, where it joined the other split of the channel and flowed south downstream south of Woods Island.

A map of June 30, 1939, showed that the entire main channel of the river followed the end of Dike 597.5–A, which was then completed, to the Nebraska side. Three sandbars show up to the west of Woods Island.

Copies of maps made by the U. S. Government Engineers' office from 1939 through each of the ensuing years to and including the year 1951 were identified by the witness. He pointed out to the court the formations of lands south of the dikes and testified: The dikes formed a barrier, slowing down the stream. As the current is slowed, silt is deposited downstream below the dikes. The channel moves over and deepens in the path of the dike. The process of silting goes on over the entire area below the dikes, but the deposit is not uniform. As the sandbars form and grow in size, the chutes narrow or disappear. Other maps in the Engineers' office showed no flow of water between Woods Island and the east bank of the new main channel of the river between 1940 and 1945,

except that in 1945, when the river was high, there was water running over a part of the land west of the island but at a place different from "the slough or low place" in the island as claimed by plaintiff. As to the land now attached to the east side of Woods Island, there was a very active chute east of the island in 1939, at which time there was a piece of land 200 feet long and 100 feet wide east of Woods Island, which later washed away. The land to the east of the island built up gradually.

On cross-examination, the witness testified: The maps concerning which he had testified were made from "low stage to a stage of about six feet above low point." Shown a map of August 20, 1950, the witness admitted it showed an outline of a willow or timber area west of Woods Island; admitted that "down here" (west of the island) there was another sand area; admitted the map reveals that at higher stages of the river water would flow around these areas; admitted that the areas referred to had willow growth on them, indicating that the lands were three or four feet above "normal low water point" and that at certain stages the river water will run between these areas and will not inundate the willows; admitted that a map of 1949 indicated that certain land areas west of Woods Island had formed and built up over a longer period of time and were higher than the chutes between them and Woods Island; admitted that a map of 1946 still showed the chute between Woods Island and the land areas to the west of the chute and that the land to the west of the chute is on higher ground and there are willows on it; and admitted that a map of 1945 showed the same situation.

On redirect examination, the witness testified: The maps show that the area west of original Woods Island show one large island. Whether the area west of the original island would be inundated islands at times would depend upon the stage of water. Following a colloquy between counsel, the court stated: "In some maps he said there was some flowage and in others there

wasn't any, and I suppose if there was flowage there would be an island, and if not there wouldn't be." The witness further testified:

"Q. * * * I want to know what happened from the time the river changed from its channel here to over there. * * * If it was a gradual change what would happen if the river moved over there from this position here? What would happen to this bar here? A. Normally you would expect it to erode because the directive force of the current would erode the bar in its path and cause the area to scour deeper, and the area which was formerly the channel would fill up.

"Q. After the channel had moved over to the Nebraska side this was the first time we have any bar land— any bar land to the east of the channel and between that and the main Woods Island, is that correct? A. * * * Well, there are some bars in there but it is hard to say whether they were destroyed in the path of moving the river over or not."

On recross-examination, the witness testified:

"Q. In other words, I believe you testified (from a 1939 map) that willows started to grow on * * * the higher ground, both of these places west of the Woods Island? A. That's right, yes, sir.

"Q. And actually in this year 1939 they were high enough that you were tying your piling on to this island, the southerly one—I mean this high land? * * * that is correct? A. Yes.

"Q. High enough so you can tie it on, and also at that same time approximately you built more piling north of the high land west of Woods Island in order to try to prevent the Missouri River from running down between the island west of Woods Island and Woods Island, that was one of the purposes of this dike across here, was to run the water—force it on that way instead of letting it go down through there and down through there (indicating)? A. That's right, that was the purpose, yes.

"Q. What year is this (indicating)? A. August 2, 1945.

"Q. That is five years, approximately five or so later, isn't it, than the map you just referred to? A. Yes.

"Q. Now, I will ask you if you don't see the same high ground almost, if not quite identical, almost identically described as the one six years before you testified about? A. It has approximately the same shape.

* * * * * *

"Q. What is the date of this map? A. August 30, 1950.

"Q. And you see approximately the same thing except this island has gotten larger, longer, is that not right? I say, this high land has gotten longer than it was before but the piling is still where it was? A. Yes.

"Q. And the formation is in general the same as it was where you looked at it the other two times in 1939 and the one just previous to this? A. Has the same general shape.

"Q. And it still shows that the slew is running down between that island and the Woods Island? A. They show on this map."

The witness further testified on redirect examination: U. S. Government reconnaissance surveys made between 1940 and 1950 showed the highest stages at which any survey was made during each of those years, but not the highest stage during such years. The map of 1940 shows a fill west of Woods Island; a sandbar area between the island and the left bank of the main channel. In 1941, when the stage was 5.3 above C.R.P. (Construction Reference Plane), the fill adjoins the island and ex-

tends to the bank of the main channel, but there is flow down the east edge of Woods Island and west of Walker-Engleman Island. In 1942, when the stage was 6.2 above C.R.P., the land fill to the west of Woods Island extended to the main channel. On the east of the island there is flow. In 1944, with river stage 5.1 above C.R.P., the fill adjoins Woods Island from its west side and extends to the main channel. In 1945, with the river stage 6.6 above C.R.P., there is flow between Woods Island and a sandbar to the west of the island and there is flow north of the island. In 1946, with the stage 4.4 above C.R.P., there is continuous fill between Woods Island and the main channel. In 1947, with the stage 6.2 above C.R.P., there is a fill to the west of Woods Island, except in several small channels which enter through the dikes at the north end of the island. In 1948, stage 5.9 above C.R.P., there is continuous fill west of the island, except leakage from upstream at the dikes. In 1949, stage 2.6 above C.R.P., there is fill to the west of the island. In 1950, stage 6.8 above C.R.P., there is continuous fill west of Woods Island to the main channel.

On recross-examination, the witness testified:

"Q. In testifying in chief, you referred to Exhibits 29, 30, 31, 32 and 33 on through here, this series of maps. Now, I will ask you, just pick me out here, say 31, at random, I will ask you * * * if there isn't evidence of a definite chute and a good-sized chute running west of Woods Island and between Woods Island and what you called that? A. A willow island, a small willow island.

"Q. (Continuing) And one, two, three, four, five willow islands which are to the west of it? A. There is evidence of a chute.

"Q. And I will ask you if the large willow island and the willow island just north of it, they both indicate that they are higher land than the chute

which runs between them and the Woods Island down— * * * A. The map indicates that the ground is higher where the willow growth is in evidence.

"Q. In other words, there is a distinct line shown on this map around both of the willow islands which you have mentioned separating them from the Woods Island by the chute which runs between the two of them? A. That's right."

Cecil Walker, one of the Walker-Engleman defendants, testified: He lived on Walker-Engleman Island during the 1930's and 1940's. Shown an "aerial photographic mosaic of Missouri River," dated 1944–1945, he stated that he saw a white sand streak in Woods Island (the chute to the west of the original island) and that he had never seen any water in it.

Alex Vogel, who lived in the vicinity, testified: In 1938–1939, he did some work around Woods Island, at which time he observed bar land around the Island. The land to the west of Woods Island "just raised up, * * * got higher."

"Q. Did you see any main channel separating any of this land to the west, what is known as the Woods Island land, and the Missouri River, the land that was out to the west of the Woods Island—Woods land? A. As I do remember there was a chute but it was so muddy you couldn't cross it.

"Q. What was the condition of the rest of the land at the same time? A. It was little low and had that chute about filled, * * * and the rest of the land just formed there, * * *."

Marion Anderson, a resident in the vicinity, testified: He had known Woods Island from 1930 to 1950. There was nothing west of Woods Island in 1935 but a sandbar. In the fall of 1939, Woods Island began to build up and so did the bars on the west and south side of the island. There was water over the island and bars in high

water. There was no separation between the bar on the west of the island and the island in low stage.

Fred Walker testified: He is a farmer and one of the Walker-Engleman defendants. In the 1930's and early 1940's he lived on Walker-Engleman Island. There was no water flowing west of Woods Island, except in times of high water.

Defendant F. Pace Woods testified: He is 63 years old, resides in Lincoln, Nebraska, has been a land owner and operator, industrial and city real estate developer, aircraft manufacturer and formerly associated with Woods Brothers Construction Company, which did a lot of river work "on all flowing rivers in the United States," including the area here in question, with which area he became acquainted in 1918, and "seriously acquainted with it in 1934", when he and his father went to look over Woods Island.

He and his father entered into a contract with Bick Engleman to take possession of the island until title could be acquired. Bick (now dead) pitched a tent on the island, near its east edge. During the next several years Bick built three houses, two of which washed away. The last house was built in 1937 and is there today. Bick cut willows on the island and cut path lines through, east and west, north and south, put in a patch of corn and raised watermelons. He was paid for his work in clearing and fencing. Bick stayed on the island until 1942. He built a fence on "what I call Woods Island" in 1940, which, due to destruction by floods, was rebuilt in 1941, 1942, 1943 and 1944. The fence extended southwest from the north end of the 194 acre tract, then in a southerly direction to the southern tip of the 194 acres. It was put up to show "our possession of the land, the accretion to the 194 acres." The fence began at a dike up at the Iowa line, then came to a point just east of the main flow at that time. It followed the river bank as nearly as possible to the south tip of Woods Island "and accretions joining it." From

July in 1939, "this land showed up continuously from our west bank over to what was then the ribbon of the river as located by the army engineers." When the survey of the 194.15 acres was made in 1939, "we surveyed right up to the water edge." Defendants' exhibit 36 is a survey of the 194 acre tract made in 1939. The first change in the formation of the west side of Woods Island came after the June flood in 1939. In August thereafter there were little sandbars and water pockets. When the water had gone down, "the sand began to blow and it did raise a few sand dunes out in the water where willows started to grow, but they were just there as a result of blowing sand." The whole area was a kind of "no man's land." The witness never saw any water flowing between the island and these formations other than at high water stage. A path was constructed from the south end of the island from a point on the center line of Section 34 to the north end of the island. Another path began on the 194 acre tract and continued on to land west of the island to a point east of the main flow of the channel. The paths were used in patrolling the island. Other paths were thereafter made. After Bick Engleman died, Al Engleman, who had lived on the Walker-Engleman Island, leased the land. Al patrolled it, sowed sweet clover and put up "no trespassing" signs all around the island until 1950, when he became ill; thereafter, "I put them up until '54", and then Lucian Smith put them up. In the early years, nothing could be done in the way of sowing except sweet clover, which was sowed from an airplane. This was done over "the whole thing." Timothy seed was also thrown from an airplane. The land was not high enough for farming until after the 1952 flood, which left a "very big fill." Since 1950, 300 or more acres have been cleared and farmed; roads, wells and a windmill have been installed. In 1954, three or four wells were put in and farming has been continuous. Corn and wheat were raised. Another 100 acres can be cleared. In 1953 and 1954, clover and brome grass were sowed. Lucian Smith has farmed the

land since 1954, receiving a share for his work. Willows have been sold to the Government. Willow dams were built in low spots west of the 194 acres and east of the main channel from 1940 until 1947 and section lines were kept cut out. A survey made for Lucian Smith shows the main flow of the river channel would be about three-eighths of a mile west of the 194 acres. Witness and his mother and father have asserted title to and possession of the land during all of the time they have been on it and no one else, other than their employees or associates, have occupied any of it. There was a very active chute east of Woods Island, with a little piece of land in it-in 1939, which washed away later. It thereafter developed as any accretion does. When the flow of the main channel was switched to the Nebraska side in 1939, the chute to the east of the island slowed up and land has accreted to Woods Island on the east side. Prior to the 1939 survey there was a small chute between the small tract to the east of the island and the island. That land to the east of the 194 acre tract is now attached to Woods Island and is in crops. The witness identified eight checks given by his father to one or more of the Englemans which the witness stated were given in payment for services rendered since 1939. Thirteen of them are found in the exhibits covering a period from August 23, 1939, to June 13, 1944, showing a total sum of $239.50. Other payments were made prior to 1939.

Defendant Lucian Smith testified: He is a farmer, residing near Union, Nebraska. He became acquainted with Woods Island in 1954, when he went to it with Pace Woods. They went all over the land. In August 1954, after making "a deal" with Woods, the witness moved a "dozer and machine" there and started clearing. A trailer house is now on the land. A survey made for Woods includes all land west of the 194 acres and east of the main channel and the land east of the 194 acre tract to the Old Chute. Photographs, identified by the witness, showed a sawmill, a trailer house, the upper end of Woods Island, "a hump" near the river on which were trees, a road, cornstalks and a swale.

Loren Coe, the County Clerk of Atchison County, testified in behalf of defendants: The county records pertaining to swamp lands showed a copy of the deed executed in 1950 to plaintiff but nothing further pertaining to the transfer. On cross-examination, the witness identified the original of the deed delivered to plaintiff by Atchison County to the lands claimed by plaintiff and identified thereon the signatures of himself and D. J. Currie, appearing at the end of the deed, reading as follows:

"Loren W. Coe

(Seal) County Clerk

"Atchison County, Missouri,
 a Corporation
By: D. J. Currie
D. J. Currie, Presiding Judge"

---

To which deed there also is attached the following signed and sealed and attested acknowledgment:

"State of Missouri ⎱
County of Atchison ⎰ SS.

"On this 6th day of June, 1950, before me appeared D. J. Currie, to me personally known, who being by me duly sworn, did say that he is the Presiding Judge of the County Court of Atchison County, Missouri, and that the seal affixed to the foregoing instrument was signed and sealed in behalf of said Atchison County, Missouri, by authority of the County Court of Atchison County, Missouri, and said D. J. Currie acknowledged said instrument to be the free act and deed of said County of Atchison, in the State of Missouri."

The witness further testified:

"Q. Now, I will ask you if the procedure followed by you and the county court of Atchison County, Missouri, in the issuance of this deed is the same procedure you use in the issuance of deed for bar land or county land?

\* \* \* \* \* \*

"A. It is handled the same way as we handle all other bar land sales."

■ Defendants have asserted eleven contentions of error, some of which will be discussed in groups. Their first contention is that plaintiff's deed is void for uncertainty, citing Williams v. Pemiscot County, 345 Mo. 415, 133 S.W.2d 417, and Schroeder v. Turpin, 253 Mo. 258, 161 S.W. 716, wherein it is held that deeds which do not describe land with such certainty as to make possible its identification are void. We do not question the rule announced in those cases.

Plaintiff's amended petition alleged title and the court declared plaintiff to be the owner and entitled to possession of the hereinafter described real estate (excepting therefrom any adjudication of title to the Walker-Engleman Island, which was adjudicated in the separate proceeding involving that issue) in Atchison County, Missouri, to wit:

"All of Sections Thirty-four and Thirty-five in Township Sixty-seven, Range Forty-three lying east of the Main Channel of the Missouri River, and all of that part of Section Three and that part of Section Ten lying north of the center of the old Chute in Township Sixty-six, Range Forty-three, except a tract of land conveyed by Atchison County to C. P. Wood by deed recorded in Book 99 at Page 434 of the records of deed in Atchison County, State of Missouri. All of said land being located in Atchison County in the State of Missouri and being all of the lands lying north of the center line of the Chute, east of the Missouri River and south of the Iowa State line, except said tract of 194.15 acres conveyed by Atchison County to C. Pace Wood as aforesaid."

Plaintiff's deed describes the real estate conveyed to plaintiff in Atchison County, Missouri, as follows:

"All of those parts of Sections Thirty-four (34) and Thirty-five (35), in Township Sixty-seven (67), Range Forty-three (43), lying east of the Missouri River and west of the lands owned by The Hamburg Realty Co., and described in a deed recorded in Book 118 at page 336 of the records of Atchison County, Mo., and also all of that part of Section Three (3) and that part of Section Ten (10) lying north of the center of the old chute, in Township Sixty-six (66), Range Forty-three (43), lying east of the Missouri River and west of the lands belonging to The Hamburg Realty Co., and described in a deed recorded in Book 119 at page 467 of the records of Atchison County, Mo., it being the intention to convey all of the land lying north of the center line of the old chute, east of the Missouri River, South of the Iowa state line and west of the land owned by The Hamburg Realty Co., a corporation, except a tract of land conveyed by Atchison County to C. P. Wood by deed recorded in Book 99 at page 434, and except easements, if any, of record, the lands hereby conveyed comprising 613.05 acres, more or less."

The description in plaintiff's deed is crudely drawn in that (1) the western boundary of the land conveyed to plaintiff is described as lying *east of the Missouri River,* whereas the pleadings and the evidence show (and defendants well knew) the land claimed and purchased by plaintiff lay *east of the new main channel of the Missouri River* as it ran along the Nebraska side, as distinguished from the east bank of the old channel on the Missouri side; and (2) there are errors in the record book numbers and pages of the deeds therein referred to as lands belonging to Hamburg

Realty Company and which said lands are stated in plaintiff's deed to be the eastern boundary of the lands conveyed to it under the instant deed.

We think defendants' contentions as to the failure of the deed to describe with reasonable certainty the lands claimed by plaintiff can be better understood and determined when it is seen from the maps that: (1) the land claimed by plaintiff lies in a sort of "U"-shape, with the Iowa-Missouri line across the top of the "U" as its northern boundary; (2) the west boundary of the "U" is the (new) main channel and borders on the *east bank of that channel*; (3) the east side and the south end of the "U" is the Old Chute; (4) defendants' 194.15 acre tract, plumb bob in outline, is suspended from the Iowa-Missouri line down into the center of the "U"; (5) the Old Chute (which curves southwesterly just south of defendants' 194.15 acre tract) is described in plaintiff's deed as the southern boundary of the "U"; (6) the land owned by Hamburg Realty Company (described in plaintiff's deed as the east boundary of the land conveyed to plaintiff) lies immediately east and south of the Old Chute; and (7) *all* of the lands hereinabove referred to (including the lands claimed by plaintiff, the lands of Hamburg Realty Company lying east and south of the land claimed by plaintiff, and the 194.15 acre tract owned by defendants) lie within Sections 34, 35 and 3, of the Townships and Range named in plaintiff's deed. Once these facts are understood it is clear that the land area claimed by plaintiff is reasonably definite and ascertainable. That the defendants knew exactly what land plaintiff claimed is conclusively demonstrated by their answer wherein they allege: "That all of the real estate described in Plaintiff's First Amended Petition are lands which have accreted to the real estate described in Paragraph 4 of this Answer, except (here reference is made to the Walker-Engleman Island tract) and that by reason whereof said lands have vested in these Answering defendants."

In general, any description in a deed is sufficient if it affords the means of identification of the property. 26 C.J.S. Deeds § 30, p. 640; Mathews v. O'Donnell, 289 Mo. 235, 233 S.W. 451, 457. Extrinsic evidence is always admissible to explain boundary calls and to apply them to the subject matter and thus give effect to the deed. City of Warsaw v. Swearngin, Mo., 295 S.W.2d 174, 181. "[A] court will declare a deed void for uncertainty of description only where, after resorting to oral proof or after relying upon other extrinsic or external proof or evidence, that which was intended by the instrument remains mere matter of conjecture, * * *." 26 C.J.S. Deeds § 30, pp. 644–645. Mathews v. O'Donnell, 289 Mo. 235, 233 S.W. 451, 457; Monroe v. Lyons, 339 Mo. 515, 98 S.W.2d 544, 547.

Defendants contend that, inasmuch as plaintiff's deed describes the land as lying east of the Missouri River, such a deed conveys to the low water mark of the river bank and no further and "therefore the deed upon which plaintiff relies conveyed no property beyond the east bank of the Missouri River and so did not include land in dispute." As stated, the original deed does refer to the land as "lying *east* of the Missouri River", instead of reciting, as it should, "lying east of the main channel of the Missouri River." But that inaccuracy is cleared up by the further statement "and west of the lands belonging to the Hamburg Realty Company" in said Sections 34, 35 and 3, which sections lie immediately east of the main channel; and by the further fact that the deed specifically excepts the 194.15 acre tract owned by defendants. Hence, it is clear that Atchison County, the grantor in plaintiff's deed (while inaccurately referring to the lands as lying *east* of the river) attempted to and in fact did convey to plaintiff 613.05 acres of land lying *east of the new main channel of the river*, rather than land lying east of the old channel on the Missouri side. In this connection, it should be noted that the parties to the suit agreed at the beginning of the trial that all

of the lands here in dispute were of *island* formation, which shows that they are situate in the old river bed between the outer high banks on each side thereof. The court so understood the deed and so construed it.

We hold that the deed, when construed in the light of all of the evidence in this case, sufficiently describes the land conveyed to plaintiff.

■ Defendants further contend that the deed was not admissible because no prior survey of the lands was made as provided in §§ 241.310, 241.320, 241.290 to 241.-340. These sections merely authorize the counties to cause lands such as those here to be surveyed and to sell them. There is nothing pointed out to us in the statutes that makes such a survey a condition precedent to a valid transfer of title, and we have found none. Defendants have cited no authority in support of their contention. It is overruled.

■ Defendants further contend that those who executed plaintiff's deed are not shown to have had any right or authority to act in behalf of the county for the reason that there was no record of any action having been taken by the county court authorizing the execution of the deed. In support of that contention they cite Article VI, § 7, of the Constitution, V.A.M.S., which provides that the county court shall manage all county business and keep an accurate record of its proceedings, and St. Louis County, to Use of Mississippi Valley Trust Co., v. Menke, Mo.App., 95 S.W.2d 818, which holds that it is essential that the county's records affirmatively show the existence of all facts necessary to have given it the jurisdiction which it purports to exercise. Sections 241.010 and 241.310, RSMo 1949, V.A.M.S., expressly invest county courts with jurisdiction of swamp lands, and § 241.160 expressly authorizes sales thereof to be made privately. Concededly, the lands herein are swamp lands over which the county court of Atchison County had jurisdiction. The county court record shows a copy of the deed delivered

to plaintiff by Atchison County, to which is attached an acknowledgment by the presiding judge reciting that it was executed by authority of the court and that it was the act and deed of the court. The record is not to be commended, but we have no hesitancy in holding that, as against collateral attack, it is sufficient. Brinkerhoff v. Juden, 255 Mo. 698, 164 S.W. 523, 528.

■ Defendants next contend that the court erred in admitting the tax receipts showing payment of taxes assessed against the property claimed by plaintiff for the years 1951 through 1957 on grounds (1) plaintiff does not claim title by adverse possession and (2) the receipts are so vague as not to show the land on which they were paid. We think they were admissible, but even otherwise the error would be immaterial. The contention is overruled.

■ Defendants next contend that the court erred:

(a) "In not striking all of the testimony of witness Delmar Broers (relating to the plats superimposed by him upon certain of the exhibits)";

(b) "In failing to sustain defendants' motion to strike the answer of witness, Johnson, to the effect that the plaintiff's deed * * * described the land covered by the defendants' surveys made in 1939 and 1957 * * *";

(c) "In overruling the two objections to witness Broers' testimony in attempting to point out the land claimed by the plaintiff as shown in the deed from Atchison County to plaintiff * * *";

(d) "In failing to sustain defendants' motion to strike all of witness Broers' testimony which relates or in any way refers to his platting the lands claimed by plaintiff * * *";

(e) "In overruling defendants' objection to witness Johnson testifying and pointing out what lands plaintiff was

claiming by virtue of the deed from Atchison County * * *."

This case was tried to the court and the purpose of the testimony of these witnesses was to aid the court in understanding the respective claims of the parties. Without such aid, the claims of the parties and the outlining thereof on the maps by competent witnesses, the trial court would have had, as this court has had, great difficulty in understanding the questions presented. There is no contention or showing whatever that any of the drawings on the maps or the testimony relating to the general outlines of the lands claimed by the respective parties were erroneous or that they in any way misled the court. The contentions are overruled.

 Defendants next contend that the preponderance of the evidence shows "the lands claimed by defendants as set forth in their answer formed by accretion to the island formation acquired by deed from the County of Atchison", citing Frank v. Goddin, 193 Mo. 390, 91 S.W. 1057; Peterson v. City of St. Joseph, 348 Mo. 954, 156 S.W.2d 691; Vogelsmeier v. Prendergast, 137 Mo. 271, 39 S.W. 83; Kimberly v. Presley, Mo., 245 S.W.2d 72; Peterson v. Harpst, Mo., 247 S.W.2d 663.

It is of no value to discuss the evidence in those cases in determining where the *preponderance of the evidence* lies in the instant case. However, the cited cases, insofar as they are pertinent here, do announce certain rules that govern the disposition of the issue of accretion here presented, once the facts are determined. In Frank v. Goddin, 193 Mo. 390, 91 S.W. 1057, 1058, it is said: "[W]here shore land has been washed away and the void space thus created becomes the river bed, and thereafter new land reforms in the river within the original survey, such new land does not necessarily belong to the owner of the survey, the riparian owner. If it be formed to the shore land by accretion or reliction, it will belong to the

riparian owner. If, on the other hand, a sand nucleolus appears in the channel off the shore, which swells, peradventure, to a nucleus and thereafter, by reason of alluvion accreting thereto, eventually reaches the geographical dignity of an island, such island with the alluvion thereto accreted does not inure to the riparian owner." In Vogelsmeier v. Prendergast, 137 Mo. 271, 39 S.W. 83, 87, it was said: "When a navigable stream forms a boundary, as in case of this island, his line extends to the water's edge, and not to the center of the stream. * * * He cannot claim new-made land, which is not an accretion, merely because it forms within the lines or area of his original survey." In Peterson v. City of St. Joseph, 348 Mo. 954, 156 S.W.2d 691, 694, an instruction was expressly approved which contained the following clause: "And if it is shown by the preponderance of the testimony in the case that the land in controversy first appeared as an island or formation of soil, sediment, or other substances out in the midst of the Missouri river, to which accretions were formed from the deposit of soil and other substances by the waters of said river, until the banks of said island or formation extending northward united with the main bank of the river, or was separated therefrom by a slough or depression only, then such lands are not an accretion to the main bank of the river * * *." To the same effect are the following cases cited by plaintiff: Cooley v. Golden, 117 Mo. 33, 23 S.W. 100, 21 L. R.A. 300; Moore v. Farmer, 156 Mo. 33, 56 S.W. 493; Hecker v. Bleish, 319 Mo. 149, 3 S.W.2d 1008, 1015. The principles announced in these cases seem clearly to be the law governing the issue of accretion as developed under the evidence.

Section 510.310 RSMo 1949, V.A.M.S., enjoins upon this court, in the review of law cases tried without a jury, the duty to "review the case upon both the law and the evidence as in suits of an equitable nature" and that "the judgment shall not be set aside unless clearly erroneous, and

due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." We give heed to that admonition. City of Warsaw v. Swearngin, Mo., 295 S.W.2d 174, 181; Sando v. Phillips, Mo., 319 S.W.2d 648, 652.

The contentions of the parties with respect to the land surrounding Woods Island (except the Walker-Engleman Island) are unique. Each claims all of the area; at least, the record does not reveal that any specific portion of the area was submitted to the trial court for its special consideration separate from other parts thereof. Neither concedes that any part of the land within the area surrounding Original Woods Island may have formed as contended by the other. In other words, plaintiff asserts that *all* of it formed independently of Woods Island: defendants contend that *all* of it constitutes an accretion to said island. Plaintiff's evidence tended to show that all of such land formed independently of Woods Island and, as it formed into islands, the chutes between the islands narrowed and closed until the land which had so formed extended to Woods Island, separated only by what had become non-active chutes, except at certain stages of the river. Defendants' evidence was that essentially all of the land formed as an accretion to the island.

We are not apprised of the precise theory upon which the trial court decided the issue of title by accretion. No finding of facts or declarations of law were requested or made. It may well have been upon the theory that all of the land that formed around the original island after defendants' grantor acquired the island was formed separate from and independently of the island, as contended by plaintiff. Or the trial court could and well may have decided the issue upon another theory advanced by plaintiff, to wit: That where the county conveys river lands by immutable lines and descriptions, as was unquestionably the description of the 194.-15 acre tract, such a conveyance should be construed, in the absence of a contrary intention, as a reservation to the county of any presently forming or subsequently accreted lands beyond the precise boundaries fixed by the deed. In the case of Ancona Realty Co. v. Frazier, 328 Mo. 750, 41 S.W.2d 820, 824, this court held that a county patent conveying river lands, in which the lines described were less definite and immutable than those set forth in defendants' deed, amounted to a reservation of adjacent forming or subsequently accreted lands. In the instant case, there is no evidence whatever of any intention on the part of the county to convey to defendants' grantor any rights to lands thereafter accreting to the specifically described 194.15 acre tract, unless it be the oral testimony of F. Pace Woods that when the survey was made for the purpose of defining the lands conveyed, "We surveyed right up to the water edge." That testimony hardly rises to the dignity of showing that the purpose of the deed was to include any lands that thereafter accreted beyond the specifically surveyed calls set forth in the deed. Rather, does it seem to make clear that the purpose of the precise description was to reserve to the grantor all lands then or thereafter forming beyond the specifically designated boundary of the land conveyed.

The trial judge had before him the maps, deeds and other exhibits and saw the witnesses, and thereby was more able to judge of their credibility and interest, if any, and to evaluate the conflicting interpretations placed upon the maps, deeds and other facts concerning which the witnesses testified than is the reviewing court. Following an exhaustive study and evaluation of the evidence of each of the parties and giving due deference to the judgment of the trial court, we have concluded that the finding of the trial court on the issue of defendants' assertion of title by accretion to the lands deeded to plaintiff is supported by the greater weight of the credible evidence and should stand.

As to the issue of title of defendants by virtue of adverse possession of the area for more than ten years, it must be conceded that defendant F. Pace Woods testified fluently in support of defendants' claim in that respect, but it is apparent that the trial judge gave his testimony little weight when he applied it to the actual conditions within the area, as shown by the maps and interpretation thereof by the witnesses. The nebulous character of the area, outside the 194.15 acre tract, from the time the witness came to the island until many years thereafter negatives a reasoned finding of any tangible thing done (or even physical ability) to take actual adverse possession of a definable or stabilized area of the then vagrant, shifting areas of sandbars, gradually forming into land.

▰▰▰ Defendants had no record (or even colorable) title to any of the lands on either side of the 194.15 acre tract. In the absence of color of title, the adverse possession of one who claims title in that manner extends only to such part of the land as he has actually occupied and possessed continuously and uninterruptedly during the statutory period. Section 516.-040 RSMo 1949, V.A.M.S.; Cullen v. Johnson, 325 Mo. 253, 29 S.W.2d 39, 47; Miller v. Medley, Mo., 281 S.W.2d 797, 801. Furthermore, it is generally held that where land is unfit for agricultural purposes and is valuable only for timber, concededly as was most of the land here in question for many years, the protection thereof against trespassers, looking after the land and making roads, while acts denoting claim of ownership, do not of themselves constitute adverse possession. Carter v. Hornback, 139 Mo. 238, 40 S.W. 893, 894; Himmelberger-Harrison Lumber Co. v. McCabe, 220 Mo. 154, 119 S.W. 357, 363; Cullen v. Johnson, supra.

Mr. Woods testified that when he assumed possession of the lands beyond the 194.15 acre tract, he did so with the deliberate intention of perfecting title thereto by adverse possession, which testimony he undertook to fortify by the recital of many activities. In judging the weight to be given that testimony, it is worthy of note that although the evidence showed that defendants paid taxes for many years on the 194.15 acre tract, yet they introduced into evidence only two such receipts. Those were for the years of 1952 and 1953 and were paid following the 1952 flood that had resulted in a very substantial increase in and enrichment of the land areas here involved. Those receipts show a tax paid on "Acres, 194.15 *acc*." and, insofar as the evidence shows, they are the first evidence of any payment of taxes on any of the lands claimed by defendants outside the 194.15 acre tract. It is also worthy of further note that when Mr. Woods (and his wife) conveyed one-half interest in said 194.15 acre tract to defendant Smith on December 31, 1956, the deed conveyed only the 194.15 acres; and it was not until January 11, 1957, that they undertook to convey to Smith any land allegedly accreted to the 194.15 acre tract. The trial court well may have concluded that defendants did not actually and uninterruptedly adversely possess any of the land beyond the 194.15 acre tract prior to any ten year period preceding the institution of this action. Certainly, defendant Smith did not do so.

▰▰▰ The law casts upon defendants the burden of establishing by a preponderance of the credible evidence all of the elements necessary to establish title by adverse possession. Pahler v. Schoenhals, Mo., 234 S.W.2d 581, 582; Krumm v. Streiler, Mo., 313 S.W.2d 680, 686; Gaskill v. Cook, Mo., 315 S.W.2d 747, 755. After careful study and evaluation of the evidence and giving due deference to the finding of the trial court, we have concluded that its finding on the issue of adverse possession should stand.

The conclusions herein reached make it unnecessary to discuss two contentions of error made by defendants: (1) that the court erred in admitting into evidence a deed clarifying the error in the record

book number of the land of Hamburg Realty Company referred to in plaintiff's deed, which deed we found unnecessary to consider in determining the sufficiency of the description set forth in plaintiff's deed; and (2) that the evidence did not establish plaintiff's title to *all* of the lands adjudged to it, for the reason that they do not demonstrate wherein the evidence warrants the exclusion of any such portion of the entire area, as distinguished from the evidence relating to the whole of the area.

The judgment is affirmed.

All concur.